[Civ. No. 1109.   Third Appellate District.—December 12, 1913.]

SAMUEL GRAY, Respondent, v. ERNEST F. O'BANION, Appellant.

ELECTIONS—BALLOT—DISTINGUISHING MARK—CROSS OUTSIDE SQUARE.— A cross on a ballot, made by the voter with the voting stamp, immediately to the right of the name of one of the candidates, and not in the voting square, constitutes a distinguishing mark under section 1205 of the Political Code.

ID.—DISTINGUISHING MARK ON BALLOT—WHAT CONSTITUTES.—A distinct mark in the form of $<$ on a ballot between the words "amend" and "section" in a referendum proposition which, from its position on the ballot with reference to the other marks properly made with the voting stamp, cannot be regarded as a transfer from such marks caused by the folding of the ballot, is a distinguishing mark.

ID.—BLURS AND OFFSETS DUE TO FOLDING BALLOT.—Blurs caused by the awkward handling and folding of ballots, and offsets, that is, the transference of the mark of the voting stamp through the folding of ballots before the ink becomes dry, are not distinguishing marks.

ID.—EDUCATIONAL QUALIFICATION OF VOTER—FINDING OF TRIAL COURT—CONCLUSIVENESS.—A finding of the trial court in an election contest that a voter was under sixty years of age at the time of the adoption of the constitutional amendment prescribing an educational qualification of voters, is conclusive on appeal.

ID.—RESIDENCE OF VOTER—DWELLING ON LINE DIVIDING TWO DISTRICTS.—Where the dividing line between two supervisorial districts runs through a dwelling-house, so that the greater part of the dining room is in one district and the other rooms are mostly or altogether in the other district, the owner or occupant has the right to vote in the latter district.

ID.—VOTING IN WRONG DISTRICT—WHETHER BARS VOTING IN RIGHT ONE.—And his right to vote there is not affected by the fact that heretofore he has illegally voted in the other district.

ID.—DOMICILE OF LABORERS ON RANCH—DWELLING IN ONE DISTRICT—BUNKHOUSE IN ANOTHER.—Where the boundary line between two election districts divides a ranch so as to leave a bunkhouse and a larger part of the dining-room of the dwelling-house in one district, and the remaining and larger portion of the dwelling-house in the other district, unmarried laborers employed on the ranch, who sleep in the bunkhouse and take their meals in such dining-room, are entitled to vote in the first district.

APPEAL from a judgment of the Superior Court of Sutter County.  Wm. M. Finch, Judge presiding.

The facts are stated in the opinion of the court.

W. H. Carlin, and A. H. Hewitt, for Appellant.

A. C. McLaughlin, and M. E. Sanborn, for Respondent.

HART, J.—The plaintiff and the defendant were opposing candidates for the office of supervisor for the fourth supervisorial district, in Sutter County, at the general election held throughout the state on the fifth day of November, 1912. There are or were, at the time of said election, six voting precincts in the said fourth supervisorial district, named as follows: Slough, Yocolumne, Rome, Knight, Barry, and Vernon.  After said election, and at the time appointed by

law, the board of supervisors of said county met and officially canvassed the votes cast in said fourth supervisorial district for the office of supervisor as said votes were returned to said board of supervisors by the respective boards of election of the six precincts in said district. Thereupon the said board of supervisors found that the plaintiff had received two hundred and twenty-four votes and the defendant two hundred and twenty-six votes for the office of supervisor for said district, and officially declared that the defendant had been elected to said office, and accordingly, caused to be issued to him a certificate of election thereto.

Within due time, the plaintiff instituted this contest, whereby he challenged the validity of the declared election of the defendant to said office, upon the grounds: That there were counted and tallied for the defendant by the boards of election certain ballots which were illegally marked and which should, therefore, have been rejected; that certain ballots in favor of the plaintiff for the office of supervisor were rejected or not counted for him by the election boards, although said ballots, it is alleged, were in legal form and had been duly and properly cast for the plaintiff; that "at least five persons whose names appeared upon the register in use at said Rome precinct, and who voted at said election for defendant for said office of supervisor . . . were not lawfully entitled to vote in said Rome precinct at said election for the reason that said five persons were each and all of them nonresidents of said precinct at the time of said election, and no one of them had been an actual resident of said Rome precinct at any time during the period of more than thirty days next preceding the date of said election."

The court found that, at said election, the plaintiff received a total of two hundred and nineteen legal votes and that the defendant received a total of two hundred and seventeen legal votes for said office of supervisor; that the plaintiff was duly elected to said office, and that the latter was, therefore, entitled to a certificate of election, to be issued by the county clerk of said county of Sutter and authenticated by the seal of the superior court in and for said county; "that the certificate of election to said office, heretofore issued to the defendant herein, should be annulled."

Judgment was entered accordingly, and this appeal is by the defendant from said judgment.

At the trial all the ballots which were cast in the supervisor district for the candidates for supervisor—the parties to this contest—were opened, inspected, and counted or rejected, according as the court conceived them to be legal or illegal because of certain marks which appeared thereon, or for other reasons. There were twenty-one ballots to the counting of which objection was interposed either by the plaintiff or the defendant, because they were claimed to be illegally marked, and these have been brought here with the record for the purpose, of course, of facilitating a determination of the question by this court whether the objections to the rulings of the trial court with respect thereto are or are not sustainable.

There were, in addition to the objections to certain ballots as above stated, some other propositions affecting the result of the vote for supervisor in said district which were submitted to and decided by the trial court. These propositions are: 1. Whether one Katie Logan, who voted at said election and cast her ballot for the plaintiff, was a qualified voter within the contemplation of that portion of section 1 of article II of the constitution which prescribes an educational test as one of the prerequisites to the right to the exercise of the privileges of an elector; 2. Whether, upon the question of residence, certain persons who voted at said election were legally entitled to vote in the precinct in which they cast their ballots.

For convenience and the purposes of the discussion of the points made for and against the respective parties, counsel, in their briefs, have grouped the above-stated propositions under two heads, viz.: "Marked Ballots" and "Illegal Votes." The former refer, manifestly, to those ballots to which objection was made upon the ground that they contained distinguishing marks—that is, marks by which the voters casting them would be enabled to identify them as their ballots. The latter refer to the vote of said Katie Logan and to those votes cast by persons who, it is claimed, were not legal residents of the precinct in which they voted at the time of said election.

In this opinion we will adopt the method thus pursued by counsel.

1. There were five ballots cast for the defendant and which were rejected by the court as containing "distinguishing marks." Of these counsel for the contestee concede that three were properly rejected by the court as bearing upon their face certain marks which, under the law, must be regarded as distinguishing marks and, therefore, invalid. The remaining two ballots cast for the defendant but rejected by the court (referring to the ballots as they were marked for identification or as exhibits at the trial) are: "Yocolumne (precinct) 15" and "Slough (precinct) 17." The rulings as to these ballots counsel characterize as erroneous, but we think the court properly rejected them. The objection to "Yocolumne 15" is that the cross made by the voter with the voting stamp was placed immediately to the right of the name of one of the legislative candidates and not in the voting square. An inspection of the ballot discloses that the voter thus marked the ballot. That this constituted a distinguishing mark under the law (Pol. Code, sec. 1205) as it now exists and has been interpreted, there can be no doubt. (See *Bass* v. *Leavitt,* 11 Cal. App. 582, [105 Pac. 771].) The case of *Tebbe* v. *Smith,* 108 Cal. 101, [49 Am. St. Rep. 68, 29 L. R. A. 673, 41 Pac. 454]), cited by the defendant in support of his position that the ballot marked as indicated is not invalid for the reason stated, is not an authority under the law as it now reads, section 1205 of the Political Code having been amended since the decision in that case, so that said section is now reasonably susceptible of no other construction in regard to the marking of ballots than that given it in *Bass* v. *Leavitt,* 11 Cal. App. 582, [105 Pac. 771]. Said section of the Political Code is mandatory, and a voter must, before casting his vote, prepare his ballot strictly according to the requirements of the law as it is therein promulgated. It may here be remarked, in this connection, that the trial court, for precisely the same reason, rejected two ballots cast for the plaintiff, and, as counsel for the latter suggest, if it might justly be held that the court erred in its ruling against the defendant as to the particular ballot under consideration, no prejudice could have resulted therefrom to the latter.

The other ballot, "Slough 17," contains a distinct mark in this form, ≮, between the words "amend" and "section" in the fourth proposition or referendum petition submitted for the consideration of the voters at said election. The mark has the appearance of having been made by means of the voting stamp, although, as is manifest, it is not the full or complete impression of the stamp. From its position on the ballot with reference to the other marks made thereon by the voter with the voting stamp, it is plain that the mark objected to could not have been an offset or, to be more explicit, a transfer from a mark properly made due to the folding of the ballot. The mark referred to being distinct and in a place on the ballot where it does not properly or legally belong, it cannot be held to be anything less than a distinguishing mark, which, as the trial court properly held, has the effect of vitiating or rendering void the ballot.

There were six ballots cast for the plaintiff which, over objection by the defendant, were counted. These ballots were marked for identification as "Barry 5," "Barry 6," "Rome 8," "Yocolumne 16," "Slough 19," and "Barry 21." It is not considered necessary specifically to review the objections to these ballots. It is deemed sufficient to say, as to said ballots, that they have been carefully examined by the light of the objections urged against them at the trial, and that we have been unable to discover or discern any legal objection to them. It may be said of them generally that the marks which they contain and which were pointed out as a means whereby they might be identified by those voting them consisted either of mere blurs which were evidently caused by the awkward handling of the ballots as they were being marked and folded or of offsets—that is, the transference of the mark of the voting stamp, through the folding of the ballot before the ink became dry, to the part of the ballot where such mark would naturally strike when the ballot was folded as required before presenting it to the proper election officer to be by him deposited in the ballot box. This is particularly true as to the ballots, "Barry," 5 and 6, which counsel for the defendant with special emphasis insist should not have been counted, the objection to "Barry 5," being based upon what clearly appears to be a blur in the space containing the word "Yes," opposite a referendum proposi-

tion presented to the voters, and the objection to "Barry 6" being founded on what plainly appears to be a transfer of the mark, properly made in the voting space opposite the name of the republican candidate for Congress, to that part of the ballot against which said mark naturally pressed by the folding of the ballot, such folding having evidently been done before the drying of the ink in the voting square above mentioned. As to the ballot marked for identification "Rome 8," it may be observed that the record shows that the objection thereto by the defendant was withdrawn by him at the trial.

The above observations with respect to the defendant's objections to the ballots cast at the election and by the court counted for the plaintiff apply with equal pertinency to the objections urged by the plaintiff against the counting for the defendant of certain ballots cast for him at said election. In other words, the challenged ballots which were counted for the defendant contained nothing indicative of an intention on the part of the voters to so mark said ballots as to admit of their identification, the marks objected to amounting only to blurs or offsets similar to those described above in referring to like objections interposed to the ballots cast and counted for the plaintiff. In a word, a careful inspection of each of the ballots sent to this court with the record compels the conclusion that there is no just or legal ground for any of the objections, whether by the plaintiff or the defendant, to the rulings of the court in disposing of said ballots. In other words, we are satisfied that the rulings of the court with respect to "Marked Ballots" were and are, under the law as it now exists, legally unimpeachable.

2. And we are satisfied with the conclusion of the trial court upon the claim of the plaintiff that certain votes cast for the defendant were not legal votes.

The written opinion of the learned trial judge, in which he discusses and disposes of the objections under the head, "Illegal Votes," is incorporated into the record. We approve what he has to say in said opinion and the conclusion arrived at by him from the facts in each of the cases of illegal votes claimed by the plaintiff. We are further satisfied that, in said opinion, he correctly states the law as applicable to each of said cases. We will, therefore, adopt the portion of

his opinion which bears upon the objections now under consideration. Before doing so, however, it may be well to remark, concerning the objection raised by the defendant to the vote of Katie Logan, hereinbefore referred to, that the constitution of this state (art. II, sec. 1,) provides, among other things, that "no person who shall not be able to read the constitution in the English language and write his or her name, shall ever exercise the privileges of an elector in this state; provided, that the provisions of this amendment relative to an educational qualification shall not apply to any person . . . who shall be sixty years of age and upwards at the time this amendment shall take effect." It should further be stated that the court received evidence of the age of Mrs. Logan, who admitted her inability to read and write, and found that, at the time of the adoption of the amendment of the constitution just quoted, she was under the age of sixty years. Mrs. Logan did not appear to know her own age and, upon her testimony and her personal appearance, the trial court reached the conclusion above indicated. This finding is conclusive upon this court.

The part of the opinion of the trial judge referred to and which we approve and adopt reads as follows:

"The vote of Katie Logan was assigned by the defendant as an illegal vote, on the ground that she was unable to read or write and that at the time of the adoption of the constitutional amendment requiring such qualification she was under the age of sixty years. It was shown without conflict that she is unable to read or write. She did not know her own age and seemed to have no appreciation of the value of numbers, but from her appearance and the facts related by her it appears that she is under the age of sixty years, and therefore her vote must be held to be illegal, and the evidence showing that she voted for the plaintiff his total vote must be reduced accordingly.

"A. T. Spencer's residence is partly in the fourth and partly in the third supervisorial district, the dividing line running through the dwelling-house, the greater part of the dining-room being in the third district and the other rooms in the house being either wholly or in greater part in the fourth district. Under the authorities hereinafter cited it

appears clear that Mr. Spencer had the legal right to vote in Rome precinct of the fourth district. The fact that he had theretofore illegally voted in Cranmore precinct in the third district cannot affect his right to vote in the precinct of which he is legally a resident. He was, of course, mistaken in the assumption that he had the right to vote in either precinct at his election, or that he could vote alternately in the two.

"The plaintiff alleged that R. L. Smart, Jess Brown, G. C. Carter and C. W. Stackhouse were illegal voters and that they cast their votes for the defendant. They were employed as farm laborers on the Spencer-Bailey Ranch lying partly in each of the two supervisorial districts. The residence or dwelling-house of the owners has already been referred to as being situate on the boundary line between the two districts. Mr. Smart slept in a small house about one hundred and fifty feet north of the boundary line between the two districts and within the said Cranmore precinct in the third district. The three other men slept in a bunkhouse which was also north of the boundary line and wholly in Cranmore precinct. All of the men ate their meals in the dining-room of the main dwelling-house but generally had access to the dwelling-house for no other purpose. When not at work or at their meals they spent their time at their sleeping quarters. From these facts the court must determine whether they were legal voters of Rome precinct.

"These men were all unmarried and without permanent homes in the ordinary sense. Their residence must be determined by rules somewhat more liberal than are applicable in cases of married men, or men with families. Yet the statute is the same for the determination in both cases.

" 'That place must be considered and held to be the residence of a person in which his habitation is fixed, and to which, whenever he is absent, he has the intention of returning.'

"While there are various other rules for determining the question of residence they have no application except in cases of men with families.

"A few authorities have a more or less bearing on the question in hand.

"In the case of *East Montpelier* v. *City of Barre*, 79 Vt. 542, [10 L. R. A. (N. S.) 874, 66 Atl. 100], the facts were as follows:

" 'The line passed diagonally through the house, leaving about six-sevenths of it in Barre town. The rear entrance was in Barre town, and the front entrance in Barre City. On the ground floor there was a kitchen, which was the general living-room, a bedroom, a pantry, and a woodshed. The woodshed and pantry were wholly in Barre town, and all of the bedroom except a small triangular section. The line ran diagonally through the kitchen, leaving a corner of the stove in Barre City. This is all we have regarding the construction and occupancy of the building.

" 'A man's dwelling-house is the building in which he lives and in a case like this the legal *status* of the building as a dwelling place must be determined by the location of that part of the structure most closely connected with the primary purposes of a dwelling. Upon this view, the facts reported place North's house in the new town of Barre.'

"In the case of *Chenery* v. *Aaltham*, 8 Cush. (Mass.) 327, the rule is laid down as follows:

" 'Where a dwelling-house is so divided by the boundary line between two towns as to leave that portion of the house in which the occupant mainly and substantially performs those offices which characterize his home, (such as sleeping, eating, sitting, and receiving visitors,) in one town, he is a citizen of that town, and has no right to elect to reside and be taxed for his personal property in the other town.'

"In *Abington* v. *Bridgewater*, 23 Pick. (Mass.) 170, the court say:

" 'It (domicile) depends not upon proving particular facts but whether all the facts and circumstances taken together, tending to show that a man has his home or domicile in one place, overbalance all the like proofs, tending to establish it in another; such an inquiry, therefore, involves a comparison of proofs, and in making that comparison, there are some facts, which the law deems decisive, unless controlled and counteracted by others still more stringent. The place of a man's dwelling-house is first regarded, in contra-distinction to any place of business, trade or occupation. If he has more than one dwelling-house, that in which he sleeps or

passes his nights, if it can be distinguished, will govern. And we think it settled by authority, that if the dwelling-house is partly in one place and partly in another, the occupant must be deemed to dwell in that town in which he habitually sleeps, if it can be ascertained. Lord Coke, in 2 Inst. 121, comments upon the statute of Marlbridge respecting courts leet, in which it says, that none shall be bound to appear . . . " ' "but in the baliwicks, where they be dwelling." ' " His lordship's comment is this: " ' "If a man have a house within two leets, he shall be taken to be conversant where his bed is, for in that part of the house he is most conversant. . . . " ' " It is then an authority directly in point to show, that if a man has a dwelling-house, situated partly within one jurisdiction and partly in another, to one of which the occupant owes personal service, as an inhabitant, he shall be deemed an inhabitant within that jurisdiction, within the limits of which he usually sleeps.'

"The authorities are well summed up in 14 Cyc. p. 851, as follows:

" 'When the boundary line between two localities passes through the residence of one whose domicile is at issue, if the portion of the house on one side of the line is sufficient to constitute a habitation by itself while the other portion is not, the first will be considered the domicile. If the line divides more equally, then that portion is deemed the domicile where the occupant mainly and substantially performs those offices which characterize his home (such as sleeping, eating, sitting, and receiving visitors); but in the event of a still closer division, then that part where he habitually sleeps is so considered in the absence of other facts showing a positively contrary intention.'

"I do not take it that the place where one sleeps is necessarily conclusive but in the absence of more satisfactory proof it is determinative of the question of residence. In the case of the four men working on the Spencer-Bailey Ranch, the place where they sleep, under the circumstances shown by the evidence, is determinative of their right to vote in the one precinct or the other, because their bunkhouse and cabin have more of the characteristics of a domicile than any other place disclosed by the evidence.

"The evidence shows that these four men voted for the defendant, and therefore his total vote must be reduced by four."

For the reasons stated herein, the judgment is affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on February 10, 1914, and the following opinion then rendered thereon.

THE COURT.—A petition for a hearing in this court after decision by the district court of appeal of the third district is denied. We are not to be understood as approving the portion of the opinion relating to two ballots marked respectively "Yocolumne (precinct) 15" and "Slough (precinct) 17," rejected by the trial court as bearing distinguishing marks. (See Pol. Code, sec. 1211, subd. 4.)

As appears from the opinion, the trial court rejected two ballots cast for plaintiff for the same reason that it rejected the ballot marked "Yocolumne (precinct) 15," with the result that no prejudice was suffered by reason of the rulings complained of.