EPTA TEEL[1] & others vs. HAMILTON-WENHAM
REGIONAL SCHOOL DISTRICT.

Essex.  November 9, 1981. — March 30, 1982.

Present: GREANEY, ROSE, & PERRETTA, JJ.

*School and School District,* Residence. *Domicil. Waiver. Restitution. Injunction.*

The inhabitants of a house which was traversed by a town line were deemed, in the circumstances, to be residents of the town containing that part of the house most closely connected with its primary purposes as a dwelling. [348-349]

No error appeared in the denial of a regional school district's claim for the cost of educating a pupil who, after legal proceedings, was determined not to reside within the district, where the judge found that the parties acted in good faith on the incorrect assumption that the pupil was eligible to attend the regional school. [351-352]

Where two pupils attended a regional school pursuant to a preliminary injunction during the pendency of litigation which ultimately determined that they were not eligible to attend the school, findings by the judge as to the good faith of the parties implied a conclusion that he would not, in his discretion, grant the district restitution of the cost of educating the pupils while the injunction was in effect. [352-353]

CIVIL ACTION commenced in the Superior Court on September 15, 1975.

The case was heard by *Linscott,* J.

*William G. Meserve* for the defendant.

*John C. Wyman* for the plaintiffs.

PERRETTA, J.  In September of 1975, the defendant school district advised the plaintiff Teel that his children, Mark and Lorie, could not be enrolled in the Hamilton-Wenham Regional public school system because they resided in Essex and not in Hamilton.  G. L. c. 76, § 5, as amended by

---

[1] Individually and as next friend of Mark and Lorie Teel.

St. 1973, c. 925, § 9A ("Every person shall have a right to
attend the public schools of the town where he actually re-
sides"). Claiming to be a resident of Hamilton, Teel sought
and obtained injunctive relief against the school district,
prohibiting it from excluding Mark and Lorie from its
schools. The school district's counterclaims for tuition for
the years of Mark and Lorie's attendance were denied. On
the school district's appeal, we conclude that Epta Teel was
not a resident of Hamilton but that the school district is not
entitled to reimbursement for tuition.

1. *Facts*

We take the facts as they appear from the parties' stipula-
tion and Epta's testimony. The Teel family resides in a house
which was purchased by the Epteel Realty Trust in 1969 and
conveyed to Epta and Joan Teel in December of 1971. Both
conveyances were by deeds describing the property as being
located on Western Avenue in Essex. During this time and
up until May, 1971, the Teel family, Epta, Joan, and the two
children, resided at 2 Blueberry Lane Extension in Essex.
The family was relocating from Essex because Joan wanted
the children to attend school in Hamilton.

The house Epta and Joan purchased to carry out this intent
is traversed by the Hamilton-Essex town line. While substan-
tial portions of the house lot are located in Hamilton and in
Essex, the house itself is almost fully situated in Essex, and it
fronts on Western Avenue, Essex. That street becomes Essex
Street as it crosses the town line into Hamilton.[2]

2

Either simultaneously with or in anticipation of the relocation, Joan filled out an application form, dated May 3, 1971, for Mark's attendance at kindergarten in the Hamilton public school system. She gave his residence as Blueberry Lane, which was not accurate. As Blueberry Lane Extension passes from Essex into Hamilton, it becomes simply Blueberry Lane. When she sought Lorie's enrollment in kindergarten in 1975, Joan listed her residence as Essex Street, which is the Hamilton continuation of Western Avenue, Essex. (See note 2, *supra*). Since moving into the house, Epta and Joan have paid their motor vehicle excise taxes to Hamilton. Epta testified that the family car is garaged in Hamilton. The entrance to the garage, which is under the Hamilton portion of the house, is in Hamilton, as is the driveway leading up to it. Although Epta could have received mail at the Essex Post Office, he opted, in 1971, for a box at the South Hamilton Post Office. The family consumes Essex water, but the property can be served by water mains from either town merely by switching a gate in the water main. Epta and Joan pay to Hamilton and Essex the real estate taxes on the respective portions of their land. Up until 1976, Essex received the tax on the entire house.

In late August of 1975, as one of the school district's bus drivers was laying out his bus routes for the kindergarten children, he noticed that the town line had to be crossed to pick up Lorie. He notified the school authorities, who in turn notified Epta, who then commenced this action.

Epta testified that, "I do everything I can do within the law, as far as I know, to reside in Hamilton." In 1976, he asked Hamilton to assess real estate taxes on that portion of the house located in that town, and Hamilton has since taxed Epta and Joan on five percent of the assessed value of the house. Sometime after September, 1975, Epta sought to become a registered Hamilton voter, but he withdrew his application after a hearing before the board of registrars of voters. He met with success when he reapplied in 1976 from the house of a son who lived at 82 Blueberry Lane, Hamilton. Epta moved into that house for over a month,

while his son was living in Beverly, after which he returned to Joan, Mark, and Lorie, who had not accompanied him to the son's house.

Epta's resolve to reside in Hamilton did not abate behind closed doors.[3] While at home, he tried to spend much time in Hamilton. There is no dining room in the house, and the family eats in the kitchen in Essex, although as Epta testified, "I can eat upstairs in Hamilton, too." There are three television sets in the house, one in each of the Essex living room playrooms, and one upstairs in Hamilton where Epta sleeps. Sleeping quarters are rotated. The second floor of the house consists of three rooms and a bath. No one has a separate, specific room because, as Epta testified, he makes "an effort to see that [the children] sleep in Hamilton" even though "we kind of fight over who's going to sleep where sometimes." The northern base of the triangular shaped Hamilton portion of the house is about seven feet long. As Joan sleeps in Essex, Epta sleeps along the longer wall in Hamilton because, as he states, "I'm the tallest, and the other two kids sleep on the third side; they're shorter than I, so they can sleep in Hamilton."

2. *The Teel Residence.*

If pallet and intent controlled, we would not hesitate to recognize Epta as a resident of Hamilton. But "[a] person's domicil is usually the place where he has his home," and home "is the place where a person dwells and which is the center of his domestic, social and civil life." Restatement

---

3

(Second) of Conflict of Laws § 11, Comment a, and § 12. Cf. *Blanchard* v. *Stearns*, 5 Met. 298, 304 (1842) (the terms resident and inhabitant both "indicate the place of one's home or dwelling place, which depends on the common law doctrine of domicil"); *Hershkoff* v. *Registrars of Voters of Worcester*, 366 Mass. 570, 576-577 (1974); *Dane* v. *Registrars of Voters of Concord*, 374 Mass. 152, 161-162 (1978). While it may generally be said that one resides in the jurisdiction in which he sleeps, when "the dividing line of the towns . . . pass[es] through the room or even across his bed," domicil becomes "a question of fact depending upon the proofs." *Abington* v. *North Bridgewater*, 23 Pick. 170, 179 (1839). The realities of the circumstances do not give way to a contrary determination, no matter how dogged, to establish a different domicil. "If [domicil] be clearly and distinctly within a certain state, the person is ipso facto a resident and citizen of that state, regardless of any intention, or rather desire, to the contrary; and the result is not affected by the additional fact that the person can, without leaving the building in which he resides, pass into an adjoining state." *Blaine* v. *Murphy*, 265 F. 324, 325 (D. Mass. 1920). See *Chenery* v. *Waltham*, 8 Cush. 327, 331, 333 (1851). That part of the Teel house most closely connected with the primary purposes of a dwelling is located in Essex. See *Abington* v. *North Bridgewater*, 23 Pick. at 182. See also *Turner* v. *City Bd. of Educ. of Mayfield*, 313 Ky. 383, 386 (1950); *Judkins* v. *Reed*, 48 Me. 386, 387 (1860); *East Montpelier* v. *Barre*, 79 Vt. 542, 545 (1907). Although we do not disagree with the trial judge's finding that the Hamilton triangle was a habitable part of the house, we conclude that that fact alone is not sufficient to establish Epta as a Hamilton resident. The facts as agreed to and related by Epta, while overwhelmingly demonstrable of his desire to live in Hamilton, conclusively show that he and his family actually reside in Essex.

### 3. *The School District's Counterclaims.*

Pursuant to G. L. c. 76, § 6, as amended by St. 1970, c. 246, § 2,[4] the school district seeks over $13,000 from Epta as reimbursement for the cost of educating Mark from 1971 to 1975, and Mark and Lorie from 1975-1980.

While the trial judge could simply have dismissed the school district's claim in view of his conclusion that the Teels resided in Hamilton, he engaged in the better practice of making specific findings on the issue in the event that the primary basis for his conclusion should be held erroneous. The judge found that from 1971 forward "[e]veryone here involved has acted in good faith" and that the "[p]laintiff has not misled the defendant." As to Mark's educational costs for 1971 through 1975, the judge further found that "a separate reason for such denial is that all the facts were available to both parties during these years, yet the defendant educated Mark as a resident of Hamilton." He concluded that "[s]ince both parties treated Mark as a resident of Hamilton during those years, the defendant cannot now ask for payment for that education."

In their arguments on appeal, the parties divide the tuition claim into ante and post injunction periods. When Epta commenced this suit, he obtained a temporary and then a preliminary injunctive order restraining the school district from excluding Mark and Lorie from its school system during the pendency of the action. Epta was not required to give security for any costs or damages that the school district might incur or suffer as a consequence of the preliminary injunction, and the record does not reveal why a bond was not required. Mass.R.Civ.P. 65(c), 365 Mass. 833 (1974). The

---

[4] "If a child resides temporarily in a town other than the legal residence of his parent or guardian for the special purpose of there attending school, the said town may recover tuition from the parent . . . . Tuition payable by the parent . . . shall, for the period of attendance, be computed at the regular rate established by the school committee for non-resident pupils, but in no case exceeding the average expense per pupil in such school for said period. The school committee of the town in which a child is temporarily residing for the special purpose of there attending school may waive all or part of the tuition charge for such child."

period prior to the injunction relates only to Mark, whereas the post injunction period involves the education costs of both children.

a. *Mark's Tuition for the 1971 Through 1975 Period.* In its brief, the school district specifically eschews an attack on the judge's findings that everyone acted in good faith and that Epta did not mislead the school district and instead argues that "[i]t is sufficient to find that the school authorities did not know prior to September, 1975, that the family lived in their present house." The school district contends that it cannot be deemed to have waived its claim for tuition by treating Mark as a Hamilton resident because waiver occurs only when there is a voluntary relinquishment of a known right. See *Niagara Fire Ins. Co.* v. *Lowell Trucking Corp.*, 316 Mass. 652, 656-657 (1944). Here it made no demand for tuition for Mark's education during the period in question because it did not know that Mark was living in the bisected house.

Taking the claim as postulated by the school district, we think that it has misconstrued the judge's findings as they relate to Mark. The denial of the claim for restitution was not based on any notion of waiver or relinquishment. The judge found that the circumstances, as they existed, of Mark's ineligibility to attend school in Hamilton were ascertainable by the parties who acted on the good faith but incorrect assumption that Mark was a Hamilton resident. As properly interpreted, the judge's findings support his denial of the school district's counterclaim for the years here in question. See *Graham* v. *Stanton*, 177 Mass. 321, 326 (1901); Restatement of Restitution § 41(a)(ii) and (b) (1937) ("A person who has rendered services to another or services which have inured to the other's benefit, is not entitled to compensation therefor if the services were rendered: [a] without the other's knowledge or reason to know of them, solely because of a mistaken belief . . . [ii] that the person rendering the services or a third person had a duty to the other or to a third person so to perform; . . . [b] with the other's knowledge, solely because of one of the mistaken

beliefs stated in Clause [a], where the other had no reason to know of the mistake or that he was expected to pay therefor and had no manifestation of a promise to pay").

b. *Mark and Lorie's Tuition for the Postinjunction Period.*

As a general rule, "Without a bond for the payment of damages or other obligation of like effect, a party against whom an injunction wrongfully issues can recover nothing but costs, unless he can make out a case of malicious prosecution. It is only by reason of the bond, and upon the bond, that he can recover anything." *Meyers* v. *Block*, 120 U.S. 206, 211 (1887), quoted and applied in *American Circular Loom Co.* v. *Wilson*, 198 Mass. 182, 211 (1908). The school district argues that this rule is not applicable where restitution, rather than damages, is sought. See *Atlantic Coast Line Ry.* v. *Florida*, 295 U.S. 301 (1935); *Littell* v. *Morton*, 369 F. Supp. 411 (D. Md. 1974); *Bedell Co.* v. *Harris*, 228 App. Div. 529 (N.Y. 1930).

Assuming without deciding that the school district's legal proposition is correct, it is nonetheless foreclosed from recovery on its counterclaim by the judge's findings. "[U]nder the principle of 'restitution' a party who obtains benefits from an improperly issued injunction, that he would not have received but for the injunction, has a duty to restore that benefit to those who have been injured by the injunction . . . . But this doctrine is tempered in that the granting of restitution is discretionary with the court." *Littell* v. *Morton*, 369 F. Supp. at 419. See *Atlantic Coast Line Ry.* v. *Florida*, 295 U.S. at 309 ("The claimant to prevail must show that the money was received in such circumstances that the possessor will give offense to equity and good conscience if permitted to retain it"); *American Circular Loom Co.* v. *Wilson*, 198 Mass. at 211 ("It was not necessarily unjust that the defendants should have been restrained from disposing of any of these patents until a final determination of the rights of the parties could be reached. If there were any special circumstances to be considered, they were doubtless brought to the attention of the [judge]").

In view of the judge's findings that everyone has acted in good faith, that Epta did not mislead the school district, that no one gave any thought to the matter until the bus driver's observation in 1975, and that thereafter the children remained in the Hamilton school system by reason of the injunction, we think it unnecessary to remand the matter for consideration of the discretionary right to allow the claims for restitution. We think it evident from these findings that the judge would not exercise his discretion in favor of allowing restitution on the counterclaim for the postinjunctive period. "The blunders being now corrected, the verities of the transaction are revealed as they were from the beginning. We think the better view is that in the light of its present knowledge the court will stay its hand and leave the parties where it finds them." *Atlantic Coast Line Ry.* v. *Florida*, 295 U.S. at 314.

Accordingly, the judgment on the complaint is reversed and a new judgment in the school district's favor is to be entered. The judgment in Epta Teel's favor on the school district's counterclaim is affirmed.

*So ordered.*