[No. H024944. Sixth Dist. Mar. 25, 2004.]

AARON L. KATZ, Plaintiff and Respondent, v.
LOS GATOS-SARATOGA JOINT UNION HIGH SCHOOL DISTRICT,
Defendant and Appellant.

Counsel

Miller Brown & Dannis and Sue Ann Salmon Evans for Defendant and Appellant.

Aaron L. Katz, in pro. per., for Plaintiff and Respondent.

Opinion

**WUNDERLICH, J.**—Aaron Katz owns property that straddles two school districts. One of them, the Los Gatos-Saratoga Joint Union School District (District), refused to enroll children living at Katz's property. That prompted this legal action by Katz. At the pleading stage, the District's successful demurrer was followed by Katz's successful appeal to this court. Following our remand, Katz prevailed at trial. The District now appeals.

At issue is whether the Education Code requires a school district to admit children who live on property that lies only partly within the district's geographic boundaries. The question is one of first impression.

Based on our interpretation of the governing statute, we conclude that the District must enroll pupils residing at the property. We therefore affirm the judgment.

## FACTS

Katz owns property at 18994 Bonnet Way in Saratoga, which is improved with a single family home. The Katz property straddles the school district boundary line, with most of it lying in the neighboring Campbell Union High School District. Only about 26 percent of the property and three percent of the home are located within the District's boundaries.

Katz's property has been assigned two different parcel numbers for tax assessment purposes: 389-21-014 (Parcel 14) and 389-21-015 (Parcel 15). The two assessor's parcels that comprise the property are divided by a tax rate area line, which forms the District's boundary with the neighboring Campbell school district. Parcel 15 lies to the east of the line, in the Campbell school district. It includes most of the house and it has been assigned all of the assessed valuation for improvements. Parcel 14 is located to the west of the line, within the District's boundaries. The District receives a portion of the real property taxes generated from the smaller Parcel 14. Under the applicable school funding formula, the District depends on local property taxes for most of its funding.

In July 1997, Katz's then tenants attempted to enroll their son in one of the District's high schools, but the District denied their application. This action ensued.

## PROCEDURAL HISTORY

In August 1997, Katz petitioned the superior court for a writ commanding the District to admit to its schools children currently and subsequently living at his property. In addition to the writ, Katz sought a judicial declaration of eligibility for admission. Katz also alleged estoppel against the District, based on its 20-year history of enrolling high school age children living at the Katz property. Finally, Katz sought monetary damages for negligence.

The District demurred, Katz filed an amended petition, and the District demurred again. Katz declined to amend further.

The trial court sustained the District's second demurrer without leave to amend, ruling that Katz had not exhausted available administrative remedies for boundary changes. The court entered a judgment of dismissal in October 1998.

On appeal by Katz, we affirmed the dismissal as to two causes of action but reversed as to the other two. (*Katz v. Los Gatos-Saratoga Union High School District* (Aug. 3, 2000, H019502) [nonpub. opn.].)

In our partial affirmance, we concluded that the trial court properly sustained the demurrer to the third cause of action, which asserted the right to declaratory relief on the ground of estoppel. We reasoned that Katz had failed to state an estoppel claim "because the District has discretion to change its interdistrict transfer policy." (*Katz v. Los Gatos-Saratoga Union High School District, supra*, H019502.) We also affirmed the judgment of dismissal as to the fourth cause of action, which sought damages for negligence. As to that cause of action, we determined that Katz had failed to present the District with an adequate claim for damages before filing suit, as required by the Government Tort Claims Act (Gov. Code, § 901 et seq.). (*Katz v. Los Gatos-Saratoga Union High School District, supra*, H019502.)

We reversed the judgment dismissing Katz's Education Code claims for writ and declaratory relief. With respect to the second cause of action, which sought a declaration of eligibility for enrollment under the Education Code, we observed that Katz had not sought a boundary change. We concluded that Katz was "entitled to a judicial determination of whether children residing in his property—with its current boundaries—are entitled to attend District's schools." (*Katz v. Los Gatos-Saratoga Union High School District, supra*,

H019502, fn. omitted.) We also said: "Depending on how the trial court answers this question, Katz's first cause of action seeking a petition for writ of mandate may also remain viable. We express no opinion on how the trial court should fulfill its obligation to interpret the statute." (*Ibid.*) We remanded the matter to the trial court to make that determination. (*Ibid.*)

After the case was returned to the superior court, Katz filed a second amended petition. The petition contained causes of action for declaratory and writ relief under the statute. The petition also sought statutory attorney's fees, based on allegations that the District had abused its discretion in refusing his property's residents admission to its schools. (Gov. Code, § 800.)

In June 2002, the trial court conducted a two-day bench trial. The court received testimonial and documentary evidence and entertained written and oral argument before taking the matter under submission. The court rendered its decision shortly thereafter, granting Katz most of the relief he sought.

In its statement of decision, the court identified Education Code section 48204, former subdivision (d) (48204(d)), as the applicable statute.[1] That section reads in part as follows: "Notwithstanding Section 48200, a pupil shall be deemed to have complied with the residency requirements for school attendance in a school district, provided he or she is: [¶] . . . [¶] (d) A pupil who lives in the home of a caregiving adult that is located within the boundaries of that school district." (§ 48204(d).) The court found the language of that provision "clear and unambiguous." Nevertheless, the court stated, to the extent it "is susceptible of two interpretations, the court must . . . construe section 48204(d) liberally in favor of petitioner." Under the court's construction of the statute, children living at Katz's property are "within" the District's boundaries and thus have the right to attend District schools. Consequently, the court concluded, Katz "is entitled to the relief he seeks by way of declaratory judgment and a writ of mandate from the court."

With respect to other issues raised at trial, the court found that Katz had not proved either that the District acted arbitrarily and capriciously or that it should be equitably estopped. Katz was awarded his costs of suit as the prevailing party, but no attorney's fees.

In July 2002, the court entered judgment in accordance with its statement of decision.

The District filed this timely appeal from the judgment. Katz did not appeal.

---

[1] Further statutory references are to the Education Code unless otherwise stated.

## ISSUES, CONTENTIONS, AND STANDARDS OF REVIEW

### I. Interpretation of the Education Code

The sole issue raised by the District's appeal is whether Katz's property is located within its boundaries for purposes of enrollment under the Education Code.

Based on its reading of the statute, the District contends that it has no duty to admit children living at the Katz property, because both the land and the residence lie mostly in the neighboring school district. Katz disagrees. He maintains that the Education Code mandates enrollment so long as any part of his property lies within the District's boundaries.

The interpretation of statutes presents a question of law for our independent review. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672].) "As the matter is a question of law, we are not bound by evidence on the question presented below or by the lower court's interpretation. [Citations.]" (*Ibid.*)

### II. Attorney Fees

Katz seeks remand to the trial court for its consideration of an award of attorney fees under the "private attorney general" theory. (Code Civ. Proc., § 1021.5.) The District argues that Katz is barred from presenting that request here, and it maintains that the fee request has no merit in any event.

The threshold determination of Katz's right to remand on the fee question is one of law. The decision concerning timeliness of the request turns on an interpretation of the governing statute. (See *Marini v. Municipal Court* (1979) 99 Cal.App.3d 829, 835 [160 Cal.Rptr. 465].) But the ultimate determination of entitlement to such fees is left to the trial court's discretion. (See, e.g., *Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933, 938 [154 Cal.Rptr. 503, 593 P.2d 200]; cf. *Austin v. Board of Retirement* (1989) 209 Cal.App.3d 1528, 1535 [258 Cal.Rptr. 106] [lack of entitlement decided as a matter of law].)

## DISCUSSION

### I. Education Code Analysis

We first consider the statutory question presented by the District's appeal. We begin our analysis by setting forth the familiar rules of statutory

construction. We then review the statutory background, giving particular attention to those provisions of the Education Code that govern this controversy. Finally, we apply the principles of statutory interpretation to the governing law.

## A. Principles of Statutory Construction

"The rules governing statutory construction are well established. Our objective is to ascertain and effectuate legislative intent. [Citations.]" (*City of Huntington Beach v. Board of Administration* (1992) 4 Cal.4th 462, 468 [14 Cal.Rptr.2d 514, 841 P.2d 1034]; accord, *Mejia v. Reed* (2003) 31 Cal.4th 657, 663 [3 Cal.Rptr.3d 390, 74 P.3d 166].)

■ In determining legislative intent, we first look to the statutory language itself. (*Mejia v. Reed, supra,* 31 Cal.4th at p. 663 [3 Cal.Rptr.3d 390].) "If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature . . . ." (*Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) "But the 'plain meaning' rule does not prohibit a court from determining whether the literal meaning of a statute comports with its purpose . . . ." (*Ibid.*) Furthermore, " 'where a word of common usage has more than one meaning, the one which will best attain the purposes of the statute should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice.' [Citation.]" (*People ex rel. S. F. Bay etc. Com. v. Town of Emeryville* (1968) 69 Cal.2d 533, 543–544 [72 Cal.Rptr. 790, 446 P.2d 790].)

"The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent possible. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1387 [241 Cal.Rptr. 67, 743 P.2d 1323].) Thus, "every statute should be construed with reference to the whole system of law of which it is a part, so that all may be harmonized and have effect." (*Moore v. Panish* (1982) 32 Cal.3d 535, 541 [186 Cal.Rptr. 475, 652 P.2d 32]; see also *Mejia v. Reed, supra,* 31 Cal.4th at p. 663; *City of Huntington Beach v. Board of Administration, supra,* 4 Cal.4th at p. 468.) Where several codes are to be construed, "they 'must be regarded as blending into each other and forming a single statute.' [Citation.] Accordingly, they 'must be read together and so construed as to give effect, when possible, to all the provisions thereof.' [Citation.]" (*Tripp v. Swoap* (1976) 17 Cal.3d 671, 679 [131 Cal.Rptr. 789, 552 P.2d 749], overruled on another point in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [181 Cal.Rptr. 893, 643 P.2d 476]; accord, *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.)

■ When an examination of statutory language in its proper context fails to resolve an ambiguity, courts turn to secondary rules of interpretation, such as maxims of construction, "which serve as aids in the sense that they express familiar insights about conventional language usage." (2A Singer, Sutherland Statutes and Statutory Construction (6th ed. 2000) § 45:13, p. 107, fn. omitted; see *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.) Courts also may turn to the legislative history of an enactment as an aid to its interpretation. (See, e.g., *Mejia v. Reed, supra,* 31 Cal.4th at p. 663; *Halbert's Lumber, Inc. v. Lucky Stores, Inc.* (1992) 6 Cal.App.4th 1233, 1239 [8 Cal.Rptr.2d 298]; see generally 2A Singer, Sutherland Statutes and Statutory Construction, *supra,* Extrinsic Aids—Legislative History, ch. 48, pp. 407–489.) "Both the legislative history of the statute and the wider historical circumstances of its enactment may be considered in ascertaining the legislative intent. [Citations.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387; accord, *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.)

■ If ambiguity still remains after resort to secondary rules of statutory construction, courts cautiously take the third and final step in statutory construction and "apply reason, practicality, and common sense to the language at hand." (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1239; see also, e.g., *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.) "Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.]" (*Dyna-Med, Inc. v. Fair Employment & Housing Com., supra,* 43 Cal.3d at p. 1387.) As both parties observe, "a statute should be interpreted to produce a reasonable result; the consequences of any particular interpretation must be considered. [Citation.]" (*Anderson Union High Sch. Dist. v. Schreder* (1976) 56 Cal.App.3d 453, 460 [128 Cal.Rptr. 529].) Absurd results are to be avoided. (*Day v. City of Fontana* (2001) 25 Cal.4th 268, 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; see also Civ. Code, § 3542 [interpretation must be reasonable].)

With the foregoing principles in mind, we turn to the issue at hand. To establish the proper framework for our analysis, we begin with an overview of the Education Code, briefly describing its development and structure.

### B. The Statutory Background

#### 1. *Development of the Education Code*

The Education Code was derived from the School Code. (See Historical and Statutory Notes, 26 West's Ann. Ed. Code (2002 ed.) preceding § 1, p. 4.) That predecessor code was enacted in 1929 "to provide for the establishment, government, maintenance and operation of the public school system of the

State of California." (Stats. 1929, ch. 23, p. 45.) It "collected most of the existing law relating to schools," which until then had been scattered in several codes and in various uncodified session laws. (Historical and Statutory Notes, 26 West's Ann. Ed. Code, *supra*, preceding § 1, p. 4.) "The School Code remained the basis of school law until 1943 when its provisions were recodified into the Education Code." (*Ibid.*) Subsequent recodifications followed in 1959 and again in 1976. (*Ibid.,* citing Stats. 1959, ch. 2, p. 595; Stats. 1976, ch. 1010, p. 2384, as amended by Stats. 1976, ch. 1011, p. 4581.) The 1976 changes to the code were effective April 30, 1977.

### 2. *Structure of the Education Code*

The Education Code is organized into three titles. (See 26 West's Ann. Ed. Code, *supra*, Education Code Analysis, p. XXIII.) Title 1 of the code contains its general provisions. The parties cite only one provision from title 1: section 2600, which deals with changes to school district boundaries. Title 2 addresses elementary and secondary education. Title 2 is organized into three divisions: state administration, local administration, and instruction and services. The latter division contains the provisions whose meaning is contested here. Title 3 concerns post-secondary education and has no relevance to the question before us.

### C. Applicable Provisions

In support of their respective statutory construction arguments, the parties cite numerous sections of the Education Code as well as several provisions from other codes.[2] Two Education Code sections are of particular importance here.

### 1. *Section 48200*

Section 48200 is part of the compulsory education law. (See 67 Ops.Cal. Atty.Gen. 452 (1984).) It requires "each parent, guardian, or other person having control or charge of [a] pupil" to send the pupil to school "for the full time designated as the length of the schoolday by the governing board of the school district in which the residence of either the parent or legal guardian is located."[3]

---

[2] Both parties discuss the provision concerning school district boundary changes, section 2600. Katz also mentions a number of Education Code sections that relate to admission in unrelated contexts, while the District discusses provisions that concern school funding. The District cites provisions from other codes as well. We discuss those statutes *post*, if and as they pertain to our analysis.

[3] That provision reads in full as follows:

"Each person between the ages of 6 and 18 years not exempted under the provisions of this

■ Section 48200 embodies the general rule that parental residence dictates a pupil's proper school district. "By the terms of Education Code section 48200, a pupil is eligible to enroll in a public school maintained by the governing board of a school district in which the pupil's parent resides." (*Anselmo v. Glendale Unified School Dist.* (1981) 124 Cal.App.3d 520, 522 [177 Cal.Rptr. 427].) Section 48200 "generally requires that children attend school in the district where the residence of either the parent or legal guardian is located . . . ." (67 Ops.Cal.Atty.Gen., *supra,* at p. 453 [a pupil whose parents live in one school district may not attend school in another district by living with friends].)

### 2. *Section 48204*

Section 48204 applies "notwithstanding" the provisions of 48200. (§ 48204.)[4]

chapter or Chapter 3 (commencing with Section 48400) is subject to compulsory full-time education. Each person subject to compulsory full-time education and each person subject to compulsory continuation education not exempted under the provisions of Chapter 3 (commencing with Section 48400) shall attend the public full-time day school or continuation school or classes and for the full time designated as the length of the schoolday by the governing board of the school district in which the residency of either the parent or legal guardian is located and each parent, guardian, or other person having control or charge of the pupil shall send the pupil to the public full-time day school or continuation school or classes and for the full time designated as the length of the schoolday by the governing board of the school district in which the residence of either the parent or legal guardian is located. [¶] Unless otherwise provided for in this code, a pupil shall not be enrolled for less than the minimum schoolday established by law."

[4] We are concerned here with the version of section 48204 that was operative until July 1, 2003. That provision reads in full as follows:

"Notwithstanding Section 48200, a pupil shall be deemed to have complied with the residency requirements for school attendance in a school district, provided he or she is any of the following:

"(a) A pupil placed within the boundaries of that school district in a regularly established licensed children's institution, or a licensed foster home, or a family home pursuant to a commitment or placement under Chapter 2 (commencing with Section 200) of Part 1 of Division 2 of the Welfare and Institutions Code. An agency placing a pupil in a home or institution described in this subdivision shall provide evidence to the school that the placement or commitment is pursuant to law.

"(b) A pupil for whom interdistrict attendance has been approved pursuant to Chapter 5 (commencing with Section 46600) of Part 26.

"(c) A pupil whose residence is located within the boundaries of that school district and whose parent or legal guardian is relieved of responsibility, control, and authority through emancipation.

"(d) A pupil who lives in the home of a caregiving adult that is located within the boundaries of that school district. Execution of an affidavit under penalty of perjury pursuant to Part 1.5 (commencing with Section 6550) of Division 11 of the Family Code by the caregiving adult shall be a sufficient basis for a determination that the pupil lives in the caregiver's home, unless the school district determines from actual facts that the pupil is not living in the caregiver's home.

The section as a whole thus embodies exceptions to the general rule of parental residence as the determinant of school district enrollment. (See 67 Ops.Cal.Atty.Gen., *supra,* at p. 453, fn. 2.) Subdivision (d) of section 48204 establishes one such exception for a pupil's deemed residency "in the home of a caregiving adult that is located within the boundaries of that school district."

---

"(e) A pupil residing in a state hospital located within the boundaries of that school district.

"(f) An elementary school pupil, one or both of whose parents, or whose legal guardian, is employed within the boundaries of that school district.

"(1) Nothing in this subdivision requires the school district within which the pupil's parents or guardians are employed to admit the pupil to its schools. Districts may not, however, refuse to admit pupils under this subdivision on the basis, except as expressly provided in this subdivision, of race, ethnicity, sex, parental income, scholastic achievement, or any other arbitrary consideration.

"(2) The school district in which the residency of either the pupil's parents or guardians is established, or the school district to which the pupil is to be transferred under this subdivision, may prohibit the transfer of the pupil under this subdivision if the governing board of the district determines that the transfer would negatively impact the district's court-ordered or voluntary desegregation plan.

"(3) The school district to which the pupil is to be transferred under this subdivision may prohibit the transfer of the pupil if the district determines that the additional cost of educating the pupil would exceed the amount of additional state aid received as a result of the transfer.

"(4) Any district governing board prohibiting a transfer pursuant to paragraph (1), (2), or (3) shall identify, and communicate in writing to the pupil's parent or guardian, the specific reasons for that determination and shall ensure that the determination, and the specific reasons therefor, are accurately recorded in the minutes of the board meeting in which the determination was made.

"(5) The average daily attendance for pupils admitted pursuant to this subdivision shall be calculated pursuant to Section 46607.

"(6) Unless approved by the sending district, this subdivision does not authorize a net transfer of pupils out of any given district, calculated as the difference between the number of pupils exiting the district and the number of pupils entering the district, in any fiscal year in excess of the following amounts:

"(A) For any district with an average daily attendance for that fiscal year of less than 501, 5 percent of the average daily attendance of the district.

"(B) For any district with an average daily attendance for that fiscal year of 501 or more, but less than 2,501, 3 percent of the average daily attendance of the district or 25 pupils, whichever is greater.

"(C) For any district with an average daily attendance of 2,501 or more, 1 percent of the average daily attendance of the district or 75 pupils, whichever is greater.

"(7) Once a pupil is deemed to have complied with the residency requirements for school attendance pursuant to this subdivision and is enrolled in a school in a school district whose boundaries include the location where one parent or both parents of a pupil is employed, or where the pupil's legal guardian is employed, the pupil shall not have to reapply in the next school year to attend a school within that school district and the district governing board shall allow the pupil to attend school through the 12th grade in that district if the parent or guardian so chooses, subject to paragraphs (1) to (6), inclusive.

"(g) This section shall remain in effect only until July 1, 2003, and as of that date is repealed, unless a later enacted statute, which is enacted before July 1, 2003, deletes or extends that date." (Stats. 1997, ch. 299, § 19.)

### 3. *Governing Provision*

Throughout this litigation, the parties have focused on section 48204(d) as the provision that governs this controversy. Following the parties' lead, the trial court did so also. In the first appeal, we did the same.

Now, however, we question the assumption that section 48204(d) applies to the question presented here.[5] As we explain, on closer analysis, it does not appear that the Legislature intended the phrase "caregiving adult" to include parents. We draw that conclusion principally from the history of section 48204.

The 1994 amendment to 48204(d) added the "caregiving adult" language. From its legislative history, it appears that the amending legislation was intended to facilitate a form of limited purpose guardianship, which is created by a nonjudicial process designed to be less costly and cumbersome than the judicial process required to establish full guardianships. (See generally *Review of Selected 1994 Cal. Legislation* (1995) 26 Pacific L.J. 204, 581–583 [review of selected 1994 legislation: relative caregiver's rights—medical care authorization]; cf. *Guardianship of Z.C.W.* (1999) 71 Cal.App.4th 524, 527 [84 Cal.Rptr.2d 48] ["there is no statutory authority for a limited guardianship providing for visitation rights to a nonparent"].) The same legislation that amended 48204(d) also added two Family Code sections. (Stats. 1994, ch. 98, § 4, p. 623, adding Fam. Code, §§ 6550, 6552.) With the addition of those provisions, the Family Code permits caregiving adult relatives to seek medical attention for children in their care. Upon compliance with the statute's affidavit requirements, the caregiver "shall have the same rights to authorize medical care and dental care for the minor that are given to *guardians* . . . ." (Fam. Code, § 6550, subd. (a), italics added.) The statute thus recognizes a category of caregivers other than guardians. The section goes on to provide that a caregiver's decision "to consent to or to refuse medical or dental care for a minor shall be superseded by any contravening decision of the *parent* or other person having legal custody of the minor . . . ." (*Id.*, subd. (c), italics added.) The significance of that provision here lies in its implication that parents—like guardians—are not in the category of caregivers. To the same effect, a notice in the caregiver's affidavit form advises that the "declaration does not affect the rights of the minor's *parents or legal guardian* regarding the care, custody, and control of the minor . . . ." (Fam. Code, § 6552, italics added.) Just as caregiving adults may authorize medical care under the Family Code, so too may they enroll their charges for school under the Education Code. (§ 48204(d).) The effect of that Education Code provision is that "a child is a resident of a school district if the home of the caregiver is in the district."

---

[5] In a letter sent before oral argument, we alerted the parties to our concern over which Education Code section governs this controversy. They addressed the point at oral argument.

(*Review, supra,* 26 Pacific L.J., *supra,* at p. 583, citing § 48204(d), fn. omitted.) Given the history, purpose, and content of the legislation that simultaneously introduced the phrase "caregiving adult" into the Education Code and the term "caregiver" into the Family Code, it is clear that the statutory reference is to persons other than parents and guardians. That conclusion is further borne out by an examination of the earlier version of 48204(d).

The 1994 amendment to section 48204(d) replaced the original 1977 version of that subdivision. The earlier version provided for deemed residency in a district for any "pupil whose parent or legal guardian has established the residence of the pupil in a home located within the boundaries of that school district, provided such home is properly licensed as required by law." (Former § 48204(d); see Stats. 1977, ch. 36, § 475, pp. 323–324.) Juxtaposed against the general rule of school attendance in the district of the parents' residence, that section provided "[t]he only possible exception that would relate to a voluntary placement of a child in a home *other than the home of the parents.* . . . But there the home would either have to be licensed by law—e.g., as a foster home . . .—or be exempted from such licensure." (67 Ops.Cal.Atty.Gen., *supra,* at p. 453, fn. 2, italics added.) Thus, even the earlier version of the statute addressed situations where pupils were residing with persons *other* than their parents or guardians, even though those persons were not then called caregiving adults.

█ To sum up, we conclude that the phrase "caregiving adult" in section 48204(d) means persons other than parents and guardians. Since this case involves children living with their parents—not with caregivers—section 48204(d) does not govern here. Instead, the applicable provision is section 48200, which ties school district enrollment to parental residence.

### 4. *Harmonizing the Provisions*

Notwithstanding our conclusion that section 48200 governs this controversy, section 48204(d) nevertheless bears on our analysis. As a matter of statutory construction, "when possible, sections of the Education Code bearing on the same subject must be read and construed together. [Citations.]" (*Santa Barbara Federation of Teachers v. Santa Barbara High Sch. Dist.* (1977) 76 Cal.App.3d 223, 235 [142 Cal.Rptr. 749]; cf. *Sequoia Union High School Dist. v. Aurora Charter High School* (2003) 112 Cal.App.4th 185, 194 [5 Cal.Rptr.3d 86] [the foregoing rule of construction does not apply to an unambiguous statute].)

Both sections concern residence within a school district for purposes of admission. Section 48200 makes a somewhat oblique reference to residency, strongly implying—though not directly stating—that the proper school district for enrollment is that "in which the [parent's] residence . . . is located."

(§ 48200.) Despite its obliquity, the " 'almost-plain wording' of the section [citations] thus defines the school district to be attended by that in which the parent resides. [Citation.]" (67 Ops.Cal.Atty.Gen., *supra,* at p. 454.) Section 48204(d) addresses residency more directly. It establishes deemed compliance with a school district's "residency requirements" for a "pupil who lives in the home of a caregiving adult that is located within the boundaries of that school district." (§ 48204(d).)

As relevant here, there are two linguistic differences between the two sections: "residence" versus "home" and "in" versus "within" a district. Section 48200 speaks to whether the parent's "residence" is located "in" the district. Section 48204(d) is concerned with whether the caregiver's "home" is located "within the boundaries" of the district.

We find those linguistic differences to be insignificant in the context of this dispute. It is a long-standing rule that the Legislature " 'will not be presumed *to have used inconsistent provisions as to the same subject in the immediate* context.' " (*In re Shafter-Wasco Irr. Dist.* (1942) 55 Cal.App.2d 484, 488 [130 P.2d 755].) Thus, as a matter of statutory construction, "if the terms we are considering have similar meanings which may be applied to them without doing violence to the language of the statute we should adopt those definitions so as to do away with apparent inconsistencies in the act." (*Southern Pacific Co. v. Riverside* (1939) 35 Cal.App.2d 380, 385 [95 P.2d 688] [Legislature intended to use statutory terms "land," "real property," and "property" synonymously].) We therefore construe section 48200 and section 48204(d) as consistent provisions. For purposes of resolving this controversy, we disregard the minor differences in word usage between the two provisions that relate to residence within a school district.

### D. Analysis: Construing the Statute

Applying the rules of statutory construction described above, we "begin by examining the statutory language, giving the words their usual and ordinary meaning. [Citation.]" (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272 [105 Cal.Rptr.2d 457, 19 P.3d 1196]; accord, *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.) "If the meaning is without ambiguity, doubt, or uncertainty, then the language controls. [Citations.] There is nothing to 'interpret' or 'construe.' [Citations.]" (*Halbert's Lumber, Inc. v. Lucky Stores, Inc., supra,* 6 Cal.App.4th at p. 1239.) The first question, then, is whether the statutory language is ambiguous.

#### 1. *Ambiguity*

The parties disagree on the question of ambiguity. Consistent with Katz's view of the statute, the trial court found it "clear and unambiguous."

However, the court added, if it "is susceptible of two interpretations, the court must . . . construe section 48204(d) liberally in favor of [Katz]." The District takes issue with that determination. The District first argues that the trial court erred to the extent it liberally construed the statute in Katz's favor. The District also maintains that the trial court's conclusion that the statute is not ambiguous contradicts the law of the case established by our prior opinion.

■ The "law of the case" doctrine cited by the District precludes a party from obtaining appellate review of the same issue more than once in a single action. When a reviewing court "states in its opinion a principle or rule of law necessary to the decision, that principle or rule becomes the law of the case and must be adhered to throughout its subsequent progress, both in the lower court and upon subsequent appeal, . . . ." (*Tally v. Ganahl* (1907) 151 Cal. 418, 421 [90 P. 1049]; see also *People v. Stanley* (1995) 10 Cal.4th 764, 786 [42 Cal.Rptr.2d 543, 897 P.2d 481]; accord, *People v. Shuey* (1975) 13 Cal.3d 835, 848 [120 Cal.Rptr. 83, 533 P.2d 211].)

In order for the doctrine to apply, " 'the point of law involved must have been necessary to the prior decision [and] the matter must have been actually presented and determined by the court, . . .' [Citations.]" (*People v. Shuey, supra,* 13 Cal.3d at p. 842.) For that reason, the first logical step is to identify what we did and did not decide in the first appeal. (*Ibid.*)

In our prior decision, we did not analyze section 48200 at all. With respect to section 48204(d), we observed: "By his declaratory relief action, Katz asks the court what the words 'a pupil who lives in the home of a caregiving adult that is located within the boundaries of that school district' means. Does 'within' mean entirely within? Partially within? More than 50 percent within? Does 'home' mean that the 'home' is within the boundaries or that the 'property' upon which the 'home' is located is within the boundaries? In the annotated codes, there are no reported cases interpreting this statute, ascertaining its meaning." (*Katz v. Los Gatos-Saratoga Union High School District, supra,* H019502, at p. 6.) Although our questions suggest that we found section 48204(d) ambiguous, we did not actually decide that issue. To the contrary, we stated: "We express no opinion on how the trial court should fulfill its obligation to interpret the statute." (*Katz v. Los Gatos-Saratoga Union High School District, supra,* H019502, at p. 8, fn. 6.)

We now decide that both section 48200 and section 48204(d) are ambiguous. First, the words "in" and "within" as used in those provisions are susceptible of more than one meaning. The word "within" "is not a 'word of art' with but one meaning—it has a variety of meanings according to the connection in which it is used." (*Town of Alexandria v. Clark County*

(Mo. 1950) 231 S.W.2d 622, 623–624.) As used in this context, it reasonably could mean either entirely within or only partially within school district boundaries. (Cf. *Citizens for Hatton Canyon v. California Dept. of Trans.* (2003) 112 Cal.App.4th 838, 844–845 [5 Cal.Rptr.3d 480] [phrase "in the coastal zone" could mean either partly or entirely within].) Furthermore, the statutes' use of the terms "residence" and "home" likewise render them reasonably susceptible of several meanings. Does the statute require the residence itself to lie entirely or partially in the district? Or is it sufficient that some part of the land on which the residence sits is within the district's boundaries?

Because the statutory language is ambiguous, we are called upon to construe it. "Our fundamental task in construing a statute is to ascertain the intent of the lawmakers so as to effectuate the purpose of the statute. [Citation.]" (*Day v. City of Fontana, supra,* 25 Cal.4th at p. 272; accord, *Mejia v. Reed, supra,* 31 Cal.4th at p. 663.)

### 2. *Statutory Purpose*

The Education Code does not explicitly set forth its overall purpose. (Cf., e.g., §§ 200, 201, which set forth the state's policy against discrimination.) But it does state: "The code establishes the law of this state respecting the subjects to which it relates, and its provisions and all proceedings under it are to be liberally construed, with a view to effect its objects and to promote justice." (§ 2.)

As the cases recognize, the code's primary aim is to benefit students. "In interpreting legislation dealing with our educational systems, it must be remembered that the fundamental purpose of such legislation is the welfare of the children. [Citations.]" (*Santa Barbara Federation of Teachers v. Santa Barbara High Sch. Dist., supra,* 76 Cal.App.3d at p. 234.)

### 3. *Interpretation*

We interpret the disputed language of the statute, keeping in mind its overriding purpose of serving the welfare of the state's children through compulsory education.

### a. *The Meaning of "In" and "Within"*

As the trial court construed section 48204(d), the Katz home is "within" the District's boundaries, even though most of the house lies in the neighboring school district.

■ We similarly construe section 48200. We conclude that the Legislature intended that section's use of the word "in" to include a residence that is even partly within school district boundaries. We therefore reject the proposition that a residence must lie entirely or even mostly within the district's boundaries as a predicate for mandatory enrollment.

First, we believe, it is untenable to construe "in" as meaning "entirely within," since any residence that straddles two school district lines cannot be wholly within either. The statute commands that all children who are "subject to compulsory full-time education . . . *shall* attend" school in the district where their parents reside. (§ 48200, italics added.) Given that legislative mandate, all pupils must be located "within" one school district or another if there is one. (Cf. § 48031: "Any person who is eligible to attend high school and who does not reside in a high school district or in a unified school district may attend high school in any high school district or unified school district in the county in which he or she resides or in another county.")

Moreover, in our view, it is equally untenable to adopt the District's preferred construction that "in" means "mostly within." Citing the principle of harmonious construction within the statutory scheme as a whole, the District urges us to construe the relevant enrollment provisions with reference to section 2600. That section provides in part: "Where boundary lines are corrected or relocated, the relocation of the new lines shall be made in such a manner that the majority of the area of the parcel or property affected determines the district in which the parcel or property is located." (§ 2600.)

According to the District, section 2600 "identifies the legislative intent that a property is deemed to be located 'within' a school district's boundary where the majority of the property lies." We disagree. While section 2600 may reflect the legislative purpose underlying boundary changes, it does not necessarily reflect the legislative purpose underlying compulsory education mandates. Although the two sections are part of the same code, they are not part of the same title. The boundary change law is contained in title 1 of the Education Code, among its general provisions. The compulsory education provisions are found in title 2. More importantly, although section 2600 and section 48200 both allude to school district boundaries, the two provisions address fundamentally different concerns. The establishment or relocation of a district's territorial boundaries—the subject of section 2600—is largely a local political question, whose resolution is left to the county's board of supervisors. (§ 2600; and cf., e.g., *Town of Alexandria v. Clark County, supra,* 231 S.W.2d at p. 624 [territorial limits of a political subdivision is a political question].) By contrast, compulsory education—the subject of section 48200—is a matter of constitutional magnitude with statewide implications. Since 1849, the California Constitution has provided: "A general

diffusion of knowledge and intelligence being essential to the preservation of the rights and liberties of the people, the Legislature shall encourage by all suitable means the promotion of intellectual, scientific, moral, and agricultural improvement." (Cal. Const., art. 9, § 1.) And as our high court observed nearly 50 years ago: "The public schools of this state are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto." (*Hall v. City of Taft* (1956) 47 Cal.2d 177, 179 [302 P.2d 574]; see also *Piper v. Big Pine School Dist.* (1924) 193 Cal. 664, 669 [226 P. 926]; cf. *Dawson v. East Side Union High School Dist.* (1994) 28 Cal.App.4th 998, 1017–1020 [34 Cal.Rptr.2d 108] [recognizing substantial local control over curriculum and incidental matters]; *City of Santa Clara v. Santa Clara Unified Sch. Dist.* (1971) 22 Cal.App.3d 152, 162 [99 Cal.Rptr. 212] [under Gov. Code, § 53091, school districts must comply with local zoning ordinances that provide for the location of public schools].) In short, section 2600 and section 48200 do not address the same primary concerns. For that reason, we do not ascribe the assumed policy underlying the boundary change provision to the provision embodying the mandate for compulsory education.

Moreover, adopting the District's position would require us to add words to the statute. Our function in construing section 48200 "is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted, . . . ." (Code Civ. Proc., § 1858.) "We may not insert words into a statute under the guise of interpretation [citation]." (*Schroeder v. Irvine City Council* (2002) 97 Cal.App.4th 174, 194 [118 Cal.Rptr.2d 330].) The statute uses the word "in" without any qualifier: it does not say "mostly" in. (§ 48200.) Of course, neither does the statute say "partly in." (Cf. *Town of Alexandria v. Clark County, supra,* 231 S.W.2d at p. 624.) But in this case, liberally interpreting "in" to mean "partly within" results in a construction that is most faithful to the overriding legislative policy that all children enjoy the benefits of free public education. (Cf. *Citizens for Hatton Canyon v. California Dept. of Transp., supra,* 112 Cal.App.4th at p. 845 [consistent with the legislative objective of protecting the coast, "in the coastal zone" means partly within]; *People v. Mejia* (1999) 72 Cal.App.4th 1269, 1272 [85 Cal.Rptr.2d 690] [consistent with legislative intent underlying criminal statute, "in the school zone" means partly within].)

Under our construction, then, even though only a small part of the house lies within District boundaries, the Katz "residence" is located "in" the District for purposes of school enrollment under section 48200. Contrary to the District's arguments regarding residency, the statute does not require us to inquire which part or how much of the house lies within the District. (Cf. *Gray v. O'Banion* (1913) 23 Cal.App. 468, 478 [138 P. 977] [absent "more satisfactory proof," voting residence is where one sleeps]; *East Montpelier v.*

*City of Barre* (1906) 79 Vt. 542 [66 A. 100] [situs of residence is determined by "the location of that part of the structure most closely connected with the primary purposes of a dwelling"]; *Teel v. Hamilton-Wenham Regional School Dist.* (1982) 13 Mass.App.Ct. 345 [433 N.E.2d 907, 909–910] [despite the general rule that "one resides in the jurisdiction in which he sleeps," "pallet and intent" did not control, given that only a small triangle of the house where the children rotated sleeping was within the defendant school district]; *Turner v. City Bd. of Ed. of City of Mayfield* (1950) 313 Ky. 383 [231 S.W.2d 27, 29] [affirming that " 'defendants whose houses are more than half and as much as two-thirds within the city' " are city school district residents].) For purposes of construing the statute before us in the factual context presented, it is sufficient that some part of the place where the parent resides is located within the geographic territory of the District.[6] Beyond that, we are not called upon to interpret the word "residence" as used in the statute or to consider whether it means the same thing as domicile, dwelling, abode, or habitation.

### b. *Avoiding Absurd Consequences*

Resisting our chosen interpretation of the statute, the District first cites the principle that courts must select a construction that avoids absurd consequences. (See, e.g., *Day v. City of Fontana, supra,* 25 Cal.4th at p. 272.) The District asserts that the chosen interpretation leads to absurd results, in that: (1) Katz's property tax dollars fund a different district; (2) residents of the Katz property have no right to vote in the District's elections; and (3) the majority of the Katz home and property lie in another district.

With respect to the property tax issue, while we are sympathetic to the District's economic plight, we do not agree that adverse funding consequences render the construction absurd. Our high court long ago confirmed that lack of available funding for students with a right to admission "is a consequence for which courts are not responsible. The economic question is no doubt an important matter to the district, but it may very properly be addressed to the legislative department of the state government." (*Piper v. Big Pine School Dist., supra,* 193 Cal. at p. 674 [Indian child entitled to attend state school].) Furthermore, implicit in the provisions permitting interdistrict transfers is the understanding that a school district may be required to educate certain students even without receiving corresponding property tax revenue. (See, e.g., § 48204, former subd. (e), which permitted the admission of students residing in state hospitals located within a school district; cf. *id.,* former subd. (f)(3), which permitted a district to refuse to accept pupils whose parents are employed by the district if "the additional cost of educating the pupil would exceed the amount of additional state aid received

---

[6] This case does not require us to decide how the statute would apply if none of the residence but some of the property were located within a school district's boundaries.

as a result of the transfer"]; *Turner v. City Bd. of Ed. of City of Mayfield, supra,* 231 S.W.2d at p. 29: "The solution of the question of residence of a child for purpose of attending school is not to be found always in the site of the property for taxation, either generally or for school purposes.")

Nor do we find that any deprivation of district voting privileges renders the construction absurd. Again, implicit in the statute permitting interdistrict transfers is the contemplation that pupils may be educated in a particular school district, even though their parents do not have suffrage rights in that district. (See, e.g., § 48204, former subds. (b) [interdistrict transfer], (c) [emancipated pupil], (f) [parent employed in the district]; cf. *Turner v. City Bd. of Ed. of City of Mayfield, supra,* 231 S.W.2d at p. 29 [place of residence for school district attendance "does not mean legal domicile in the technical and narrow sense of residence of a person for purpose of taxation or suffrage"].)

We likewise disagree with the District's final claim of absurdity, which is based on the fact that the majority of the Katz home and property lie in another district. We have already explained our determination that "in" means "partially within" for purposes of this statute. As we recently recognized in another context, that is not an absurd construction. (*Citizens for Hatton Canyon v. California Dept. of Transp., supra,* 112 Cal.App.4th at p. 845 [same construction with respect to the Coastal Zone is neither absurd or "against all common sense"]; see also *People v. Mejia, supra,* 72 Cal.App.4th at p. 1272 [same construction is a "commonsense application" of Penal Code provision].)

c. *Administrative Interpretation*

At trial, the District offered an opinion authored by counsel for the Santa Clara County Office of Education, which addressed the question of the proper interpretation of section 48204. That opinion states: "Although the Education Code doesn't address the determination of legal residence under split parcel circumstances, we believe that school districts and county offices of education are required, as a matter of common sense if nothing else, to make such a determination of legal residency. When making this determination we look at criteria such as (1) the district in which the Registrar of Voters determines the residents vote; (2) the district in which the house is sited; and (3) the district in which the greatest portion of property (or assessed valuation) is located." With respect to the Katz property, the opinion concluded, "according to our criteria, the address is within the Campbell Union High School District." On appeal, the District argues that the opinion is entitled to great weight, as an agency's interpretation of a statute it is charged with administering. Katz

disagrees. As a factual matter, he contends, the County Office of Education is not charged with administering the enrollment statute. As to that point, Katz cites trial testimony from a District employee as to her belief that the County Office of Education does not "determine the property boundary lines but only the changes to those lines." As a legal matter, he argues, the opinion improperly usurps the judicial imperative of statutory interpretation.

We must determine what legal effect to give the opinion. For purposes of resolving that question, we will assume (without deciding) that the County Office of Education opinion constitutes an agency interpretation of a statute it is charged with administering. As we explain, however, we conclude that the opinion is not entitled to any deference by this court.

"An agency interpretation of the meaning and legal effect of a statute is entitled to consideration and respect by the courts; however, . . . the binding power of an agency's interpretation of a statute or regulation is contextual: Its power to persuade is both circumstantial and dependent on the presence or absence of factors that support the merit of the interpretation." (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7 [78 Cal.Rptr.2d 1, 960 P.2d 1031], italics omitted.) "Unlike quasi-legislative rules, an agency's interpretation does not implicate the exercise of a delegated lawmaking power; instead, it represents the agency's view of the statute's legal meaning and effect, questions lying within the constitutional domain of the courts. But because the agency will often be interpreting a statute within its administrative jurisdiction, it may possess special familiarity with satellite legal and regulatory issues. It is this 'expertise,' expressed as an interpretation . . . , that is the source of the presumptive value of the agency's views." (*Id.* at p. 11.) "Where the meaning and legal effect of a statute is the issue, an agency's interpretation is one among several tools available to the court. Depending on the context, it may be helpful, enlightening, even convincing. It may sometimes be of little worth. [Citation.]" (*Id.* at pp. 7–8.)

In this case, we find the County Office of Education opinion to "be of little worth." Two of the three criteria on which it depends—the resident's voting precinct and the property's ratio of assessed valuation—find no support in the statute. Because it effectively "alters or enlarges the terms of [the] statute," the opinion does not govern the decision here. (*Traverso v. People ex rel. Dept. of Transportation* (1996) 46 Cal.App.4th 1197, 1207–1208 [54 Cal.Rptr.2d 434].) Nor do we find it persuasive. (*Yamaha Corp. of America v. State Bd. of Equalization, supra,* 19 Cal.4th at p. 7.)

d. *Other Authority*

Finally, we are not persuaded by the District's citation of secondary sources and authority from other jurisdictions. As we previously explained,

given the legislative policy underpinning the compulsory education statute, we need not consider what percentage or which rooms of the *Katz* house are situated within the District's territory. Thus, for purposes of interpreting section 48200, we do not subscribe to the view that a home's location is determined by where its inhabitants sleep. (cf. *Gray v. O'Banion, supra,* 23 Cal.App. at p. 478; cf. *Teel v. Hamilton-Wenham Regional School Dist., supra,* 433 N.E.2d at p. 910.) Nor do we agree with the District that "conformity with case law and common sense" demands application of the Restatement rule for split parcel cases, which "usually" assigns legal situs "where the major portion of the dwelling place is located . . . ." (Rest.2d Conf. of Laws, § 18, com. h, p. 75.) Giving the compulsory education law the liberal construction that its essential purpose demands, we reject an approach to interpretation that examines either the size or the function of that portion of a residence lying within a school district. We abide by our interpretation, which we believe is faithful to the Legislature's intent: So long as some part of a home is situated within the geographic territory of a school district, its residents are eligible for admission to the district's schools.

### E. Summary of Conclusions

The Education Code provision that governs this case is section 48200, which ties school district enrollment to parental residence. Construing that section in harmony with section 48204(d), we disregard minor linguistic differences between the provisions relating residence within a school district. Because it is ambiguous, it is our duty to construe section 48200 in a manner that effectuates its underlying statutory policy.

As we interpret section 48200, the Katz residence is in the District, even though only a small part of the house lies within the District's boundaries. Our construction is reasonable, it does not lead to absurd results, and it comports with the legislative policy underlying the compulsory education law.

### II. Katz's Fee Request

At trial, Katz sought statutory attorney's fees pursuant to Government Code section 800. The factual predicate for such an award is "arbitrary or capricious action or conduct by a public entity." (Gov. Code, § 800.) The trial court specifically found that Katz did not carry his burden of proving such conduct, thus rejecting by implication Katz's prayer for fees. The court's implicit denial of attorney's fees "was thus part of the judgment in the present matter, and is beyond our review for want of a timely appeal." (*Guillemin v. Stein* (2002) 104 Cal.App.4th 156, 161 [128 Cal.Rptr.2d 65] [discovery sanctions].)

On appeal, Katz seeks a remand to the trial court so that it may consider attorney's fees pursuant to another statutory provision, Code of Civil Procedure section 1021.5. That provision, which is sometimes called the "private attorney general" statute, authorizes an award of attorney's fees to the "successful party" in certain actions resulting in the "enforcement of an important right affecting the public interest." (Code Civ. Proc., § 1021.5.)

The District opposes that fee request on both procedural and substantive grounds. The District argues that the request should be rejected because it was not first raised in the trial court. The District further contends that the fee request has no substantive merit under the statutory criteria.

## A. Timeliness

It is well established that "a motion for attorney fees under section 1021.5 *need not* be made and determined until after the judgment is final." (*Marini v. Municipal Court, supra,* 99 Cal.App.3d at p. 835, original italics.) In fact, the language of that provision itself contemplates that "the showing required by statute could not have been made prior to judgment." (*Folsom v. Butte County Assn. of Governments* (1982) 32 Cal.3d 668, 679 [186 Cal.Rptr. 589, 652 P.2d 437], fn. omitted.) For that reason, courts expressly recognize requests for remand first made on appeal. (See, e.g., *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 226 [226 Cal.Rptr. 265].)

## B. Entitlement

"Determining whether Code of Civil Procedure section 1021.5 is applicable, and if so, the amount of attorneys' fees that are reasonable, is generally left to the sound discretion of the trial court. [Citations.]" (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 176 [217 Cal.Rptr. 893]; see also, e.g., *Woodland Hills Residents Assn., Inc. v. City Council, supra,* 23 Cal.3d at pp. 933, 938.) We therefore express no opinion on the substantive merits of the fee request.

## C. Remand

Even in the absence of a specific remand from this court, the trial court has jurisdiction to entertain a request for fees under Code of Civil Procedure section 1021.5. (*Citizens Against Rent Control v. City of Berkeley, supra,* 181 Cal.App.3d at p. 226.)

In short, the trial court properly may consider Katz's fee request following our remittitur.

## DISPOSITION

The judgment is affirmed. Katz is entitled to costs on this appeal. On appropriate motion, the trial court may consider a request for attorney's fees pursuant to Code of Civil Procedure section 1021.5.

Bamattre-Manoukian, Acting P. J., and Mihara, J., concurred.