Filed 8/13/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CALIFORNIA DEPARTMENT OF INDUSTRIAL RELATIONS, DIVISION OF OCCUPATIONAL SAFETY AND HEALTH,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>CALIFORNIA OCCUPATIONAL SAFETY AND HEALTH APPEALS BOARD,<br><br>      Defendant and Appellant,<br><br><br>AC TRANSIT (ALAMEDA-CONTRA COSTA TRANSIT DISTRICT),<br><br>       Real Party in Interest and Appellant. | A142799<br><br>(County of Alameda No. RG13687314) |

In this appeal, we consider a narrow question of regulatory interpretation: Can the interior of a non-air-conditioned bus be deemed an "outdoor place of employment" for purposes of the heat illness prevention standards promulgated by the California Occupational Safety and Health Standards Board (Standards Board) as stated in section 3395 of title 8 of the California Code of Regulations (section 3395)? After the Department of Industrial Relation's Division of Occupational Safety and Health (Division) cited the Alameda-Contra Costa Transit District (AC Transit) for several violations of section 3395 involving its non-air-conditioned buses, AC Transit sought administrative review, arguing, among other things, that the buses were not "outdoor" places of employment for purposes of the heat illness prevention regulation. The Occupational Safety and Health Appeals Board (Appeals Board) ultimately agreed,

1

affirming the dismissal of the appealed-from violations by one of its administrative law judges (ALJ).  However, after the Division filed a petition for writ of mandate in the trial court disputing this decision, the trial court determined that the Appeals Board's definition of "outdoor" was too narrow and issued a peremptory writ of mandate instructing the Appeals Board to reconsider the matter using a broader definition of outdoor that could include non-air-conditioned vehicles.  Both AC Transit and the Appeals Board appealed.  We conclude—based upon our independent analysis of the question—that the trial court's construction of section 3395 is well supported both by the language of the regulation and by its related regulatory history.  We therefore remand the matter for further proceedings consistent with our analysis.

## I.  BACKGROUND

The three state agencies relevant to these proceedings are all branches of California's Department of Industrial Relations that are involved in the regulation of workplace health and safety.  The Standards Board promulgates regulations setting occupational health and safety standards.  (Lab. Code, § 140 et seq.)  The Division enforces those standards, inspecting workplaces and issuing citations for health and safety violations.  (*Id.*, § 142; see also *id.*, § 6300 et seq.)  Finally, it is the responsibility of the Appeals Board to adjudicate appeals of Division citations.  (*Id.*, § 148 et seq.)  As the trial court pointed out below, this case presents "the interesting situation" where the Division and the Appeals Board advocate different interpretations of regulations issued by the Standards Board.[1]

Section 3395—the regulation here at issue—sets forth requirements for heat illness prevention in outdoor places of employment and was initially adopted by the Standards Board in 2005 as an emergency regulation after an unusual number of reports of serious occupational heat-related illnesses and deaths that year.  Thereafter, the Standards Board initiated a rulemaking action to promulgate a permanent version of section 3395, issuing an Initial Statement of Reasons (See Standards Board, Initial

---

[1] The Standards Board is not a party to these proceedings.

2

Statement of Reasons, New Section 3395: Heat Illness Prevention (ISOR).)  In 2006, the Standards Board issued its Final Statement of Reasons, responding to oral and written comments. (See Standards Board Final Statement of Reasons, New Section 3395: Heat Illness Prevention (FSOR).)  It then adopted the permanent version of section 3395 applicable broadly to "all outdoor places of employment."  (former Cal. Code Regs., tit. 8, § 3395, subd. (a), Register 2006, No. 30 (July 27, 2006).)[2]  Generally speaking, section 3395 sets standards for the provision of water, shade, and training for employees working in outdoor environments.  (*Ibid.*)

AC Transit operates transit buses throughout Alameda County and adjoining areas.  Bus routes range from 15 minutes to over an hour, with a small recovery time scheduled at the end of each route, which may or may not be available to the driver depending on whether he or she is running on schedule.  Drivers can be behind the wheel driving for up to ten hours a shift.  During relevant timeframes, AC Transit employed between 1200 and 1900 drivers and operated 695 buses, only 20 percent of which were air-conditioned.  In November 2007, the Division cited AC Transit for three alleged violations of section 3395 with respect to the operation of its non-air-conditioned buses: (1) failure to supply adequate drinking water to drivers; (2) failure to make shade continuously available for drivers; and (3) failure to develop heat illness procedures and related training for employees and supervisors.  (See § 3395, subds. (c), (d), & (e).)

AC Transit appealed, and an administrative hearing before an ALJ was subsequently held over the course of several days.  During the hearing, several bus drivers testified that it was normally hotter inside the buses than outside during the

_____

[2] The 2006 version of section 3395 is the operative version of the regulation for purposes of this appeal, and all unidentified references to section 3395 shall be to the 2006 version.  Section 3395 was subsequently amended twice, in 2010 (2010 version) and 2015 (current version).  (See history following Cal. Code Regs., tit. 8, § 3395.)  We discuss the relevance of later iterations of the regulation below.  Like the 2006 version of section 3395, however, both the 2010 version and the current version cover "all outdoor places of employment," and neither define the phrase.  (See Cal. Code Regs., tit. 8, § 3395; former Cal. Code Regs., tit. 8, § 3395, subd. (a), Register 2010, No. 41 (Oct. 5, 2010).)

3

daytime, even when the exterior temperature was in the 70s. They further reported that some of the non-air-conditioned buses had issues with ventilation and engine compartments that radiated heat into the bus interior. One driver, who was also a union representative, testified that he had heard concerns from AC Transit drivers "[t]hat the conditions on very hot days were unhealthy and unsafe." A Division employee explained that the variable weather pattern in AC Transit's service area created a risk of heat illness due to lack of time for drivers' bodies to acclimatize during short-term heat waves. Further, in one heat wave—with outside temperatures between 93 and 97 degrees—this employee had measured temperatures between 97 and 102 degrees immediately behind the driver seats on four AC Transit buses. Another Division employee noted that sitting next to large windows subjects bus drivers to direct solar radiation, adding to their bodies' heat burden. Finally, an occupational medicine physician and consultant to the Division testified that the effects of even mild heat illness could impair a bus driver's ability to multi-task, leading to safety risks. AC Transit put on no evidence, conceding that it had not complied with section 3395. It argued, instead, that it was not subject to the regulation and that section 3395 was unenforceably vague.

After considering the evidence presented, the ALJ concluded that "the term 'outdoor places of employment' [in section 3395 was] a relatively new term, without a proven 'common usage' and no 'common law meaning.' " Moreover, after a review of various dictionary definitions of "outdoor," the ALJ further found that "there is more than one common meaning" for that term. The ALJ thus reviewed the regulatory history of section 3395 in an attempt to ascertain its underlying purpose and decided that the "weight of the evidence" argued against defining "outdoor places of employment" to include "the interiors of municipal transit buses." He therefore dismissed the citations and vacated the corresponding penalties and abatement requirements. In response, the Division filed a petition for reconsideration with the Appeals Board on the "sole issue" of whether "drivers of non-air-conditioned public transit buses are excluded from coverage" under section 3395.

4

In its Decision After Reconsideration (DAR), the Appeals Board agreed with the conclusion of the ALJ, albeit under different reasoning. After incorporating the ALJ's Summary of Evidence, the Appeals Board declared that the plain meaning of section 3395 confirmed that bus interiors are not outdoor places of employment for purposes of the regulation. Rather, based on a review of dictionary definitions, the Appeals Board opined that "the ordinary and commonsense meaning of the word 'outdoor' means literally to be 'out of doors,' or in an open air environment." In making this determination, the Appeals Board expressly rejected the Division's assertion that non-air-conditioned buses could qualify as outdoor places of employment based on the regulatory history of section 3395, stating: "We do not find any support in the rulemaking record or the regulation's text itself that would support that the meaning of the word 'outdoor' turned on the existence or non-existence of a cooling device."

Refusing to accept this result, the Division filed a petition for writ of mandate in Alameda County Superior Court, asserting that the Appeals Board's conclusions in its DAR amounted to a prejudicial abuse of discretion and were clearly erroneous. After briefing and hearing, the trial court agreed, issuing an order granting the Division's petition (Order). In particular, the trial court concluded that the Appeals Board erred in limiting the definition of "outdoor" for purposes of section 3395 to " 'out of doors' or 'in an open air environment.' " Instead, the trial court agreed with the ALJ that there is no single, common meaning for the term "outdoor," and thus the plain text of the regulation was not helpful in determining regulatory intent. The court therefore considered the regulatory history related to the Standards Board's adoption of section 3395 and concluded that "the Standards Board intended the regulations to protect employees who did not have 'the environmental protections indoor working environments can provide.' " The court further found, however, that the regulatory history contained conflicting statements regarding the scope of the term "outdoor." It thus went on to consider whether deference should be granted to either of the contradictory interpretations of "outdoor" advocated by the Division and the Appeals Board, and determined that the Division's interpretation was entitled to greater deference than the Appeals Board's

5

construction.  In the end, the court held that, for purposes of section 3395, " 'outdoors' is defined as 'out of doors' or 'not in a building' and that if an enclosure or structure does not provide sufficient environmental protections to be considered 'indoor' then it is 'outdoor.' "  On this basis, the trial court granted judgment in the Division's favor (Judgment) and ordered issuance of a writ of mandate (Writ), directing the Appeal's Board to set aside its decision and reconsider the matter in accordance with this "proper" definition of "outdoor."

Timely notices of appeal were subsequently filed by both AC Transit and the Appeals Board, bringing the matter before this court.

## II. DISCUSSION

### A.    *Rules of Interpretation and Standard of Review*

"The interpretation of a regulation, like the interpretation of a statute, is, of course, a question of law" and is therefore subject to our de novo review.  (*Carmona v. Division of Industrial Safety* (1975) 13 Cal.3d 303, 310 (*Carmona*).)  Accordingly, while an administrative agency's interpretation of its own regulation is entitled to deference appropriate to the circumstances, "the ultimate resolution of such legal questions rests with the courts."  (*Ibid.*; *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7-8, 11-13 (*Yamaha*) [An agency's interpretation of a regulation is contextual and is only one among several tools available to the court:  "Depending on the context, it may be helpful, enlightening, even convincing.  It may sometimes be of little worth."].)  When interpreting an administrative regulation, we follow the same rules of construction that apply to statutes.  (*County of Sacramento v. State Water Resources Control Bd.* (2007) 153 Cal.App.4th 1579, 1586 (*Sacramento County*).)  Thus, our fundamental objective is to ascertain and effectuate the intent of the agency issuing the regulation. (*New Cingular Wireless PCS, LLC v. Public Utilities Com.* (2016) 246 Cal.App.4th 784, 795 (*New Cingular*); see also De *La Torre v. California Horse Racing Bd.* (2017) 7 Cal.App.5th 1058, 1066 (*De La Torre*); *Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 54 (*Katz*).)

6

In determining the issuing agency's intent, we look first to the language of the regulation itself. (*Katz*, *supra*, 117 Cal.App.4th at p. 54; *De La Torre*, *supra*, 7 Cal.App.5th at p. 1066.) " 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the [agency]. . . .' [Citation.] 'But the "plain meaning" rule does not prohibit a court from determining whether the literal meaning of a [regulation] comports with its purpose. . . .' [Citation.] Furthermore, ' "where a word of common usage has more than one meaning, the one which will best attain the purposes of the [regulation] should be adopted, even though the ordinary meaning of the word is thereby enlarged or restricted and especially in order to avoid absurdity or to prevent injustice." ' " (*Katz*, *supra*, 117 Cal.App.4th at p. 54; see also *New Cingular, supra,* 246 Cal.App.4th at pp. 796-797 [choosing from "any number of permissible interpretations" the one that was reasonable—keeping in mind the "Legislature's expressly stated intent.") Moreover, "[w]e do not construe a regulation in isolation, but instead read it with reference to the scheme of law of which it is a part, so that the whole may be harmonized and retain effectiveness." (*De La Torre*, *supra*, 7 Cal.App.5th at p. 1066; *New Cingular, supra,* 246 Cal.App.4th at p. 795.) Finally, when an examination of regulatory language in its proper context fails to resolve an ambiguity, courts may "turn to the [regulatory] history of an enactment as an aid to its interpretation." (*Katz, supra*, 117 Cal.App.4th at p. 55.)

With all of the foregoing principles in mind, we address the task at hand: interpreting the term "outdoor" in the context of the Standard Board's heat illness prevention regulation, section 3395.

## B.     *Application of Section 3395 to Non-Air-Conditioned Vehicles*

If one thing is clear in this case, it is that the term "outdoor places of employment" as used in section 3395 is not clear. Thus, contrary to the conclusion reached by the Appeals Board in this matter, there is no dispositive "plain meaning" that can be relied upon when determining its import. Rather, "outdoor" can be defined variously as: something "[t]hat is done, exists, lives, or is used, out of doors, without the house, or in the open air" (X Oxford English Dict. (2d ed. 1989) p. 1011); "existing, happening, or

7

done outside a building" (Cambridge Dict. <https://dictionary.cambridge.org/us/dictionary/english/outdoor#dataset-american-english> [as of Aug. 13, 2018]); "of or relating to the outdoors" or "not enclosed: having no roof" (Merriam-Webster's Collegiate Dict. (11th ed. 2014) p. 880 (Merriam-Webster's)); and "characteristic of, located, occurring, or belonging outdoors" (Dictionary.com <http://www.dictionary.com/browse/outdoor> [as of Aug. 13, 2018] (Dictionary.com)). Similarly, when used in its noun form—as in some definitions of outdoor—"outdoors" is defined in a number of ways as well, including: "any area outside buildings or shelter, typically [] far away from human habitation" (English Oxford Living Dicts. <https://en.oxforddictionaries.com/definition/outdoors> [as of Aug. 13, 2018]); "a place outside, away from buildings, where you can experience nature" (Cambridge Dict. <https://dictionary.cambridge.org/us/dictionary/ english/outdoors>) [as of Aug. 13, 2018]; "a place or location away from the confines of a building" (Merriam Webster's at p. 880); or "the world outside of or away from houses; open air" (Dictionary. Com). It thus appears that the term "outdoor" includes within its common meanings both the idea of being "outside of a building" and the notion of being "in the open air."

Because the plain language of the regulation is not dispositive, we turn next to the relevant regulatory history. (See *J.G. Boswell Co*. (CALOSHA, Feb. 21, 1991) OSHAB 90-R2D5-284 [1991 WL 528460], Decision After Reconsideration [Final Statement of Reasons approved by the Standards Board is "clear evidence of the intent of the Standards Board"].) As stated above, after issuance of an emergency heat illness prevention regulation, the Standards Board promulgated the permanent, 2006 version of section 3395 at the culmination of an administrative rulemaking process which included issuance of an ISOR and a FSOR. The ISOR states that section 3395 applies only to *outdoor* places of employment in order to "limit the requirements of the proposed standard to employers with employees having significant exposure to outdoor work, with the intended effect of protecting employees performing such work from the increased risk of heat illness that can result from working *without the environmental protections indoor working environments can provide*." (ISOR at p. 2, italics added.)

8

Despite a number of requests after issuance of the ISOR, the Standards Board expressly declined to expand section 3395 to indoor places of employment. (FSOR at pp. 6-7, 50-51, 54.) Although the Standards Board recognized that "risk of heat illness is not limited to outdoor work environments, and that in fact some of the most severe exposures to heat can occur in artificially heated environments," it believed that the "vast majority" of serious cases had occurred "where the employee is working out of doors." (FSOR at p. 6.) The Standards Board indicated its intent to study indoor environments at a later time. (*Id.* at p. 7.)

In addition, the Standards Board declined a request to include a definition of "outdoor places of employment" in section 3395, stating that it did not believe it was necessary. (FSOR at pp. 27-28.) In particular—in a statement highly relevant to the instant case—the Standards Board rejected a definition of "outdoor" which would include "nominally outdoor places of employment," stating: "The [Standards] Board recognizes that packing sheds and partial or temporary structures, such as tents, lean-tos, and structures with one or more open sides, can be either indoor or outdoor workplaces depending on the circumstances. In many case these structures may actually be hotter than the environment outside of them because of heating by the sun and conditions inside like limited air circulation and/or lack of insulation. *The Board believes that it is clear the standard is intended to protect employees from heat illness resulting from exposure to outdoor environmental risk factors, and therefore temporary or partial structures that do not significantly reduce the net effect of the environmental risk factors that exist immediately outside should be considered outdoor workplaces.*" (*Ibid.*, italics added.) We believe this statement is strong evidence that the Standards Board intended section 3395 to apply to workplaces outside of a building where the environmental protections offered are insufficient to reduce existing environmental risk factors for heat illness, as the trial court held.

There are, moreover, additional statements in the regulatory history that further support this view. For instance, in response to a request that work vehicles used for extended travel be required to have working air conditioning systems during periods of

9

extreme heat, the Standards Board opined: "*The proposed standard would apply to non-air-conditioned work vehicles used for extended travel during periods of extreme heat. Employees traveling in these conditions are entitled to all of the protections provided by the standard including access to shade*. The standard specifically states, 'Shade is not adequate when heat in the area of shade defeats the purpose of shade, which is to allow the body to cool. For example, a car sitting in the sun does not provide acceptable shade to a person inside it, unless the car is running with air[-]conditioning.' The [Standards] Board is not aware of any scientific evidence that passengers riding in a work vehicle, in compliance with motor vehicle and other applicable standards, are exposed to a greater risk of heat illness than workers *at other outdoor workplaces*, which are not required to be air-conditioned. The [Standards] Board believes the issues related to the necessity and feasibility of a proposed requirement for air-conditioned vehicles were not adequately vetted during this rulemaking. Therefore the [Standards] Board does not believe that further modification to the proposal is necessary as a result of this comment." (FSOR at p. 30, italics added; see also ISOR at p. 3; § 3395, subd. (b).)[3] Thus, the Standards Board expressly distinguished air-conditioned and non-air-conditioned vehicles for purposes of section 3395, confirmed that it was not requiring that air conditioning be installed to comply with the terms of the regulation, and clearly believed that non-air-conditioned vehicle interiors could be deemed outdoor places of employment.[4]

It is true that the emergency version of section 3395 "limited application of its provisions to 'outdoor places of employment *at those times when the environmental risk factors for heat illness as defined in (b), are present*.' " (See ISOR at p. 2, italics added.)

---

[3] Although this request was made by the California Rural Legal Assistance Foundation, there is no indication that the Standards Board's statements in response are limited to agricultural transport vehicles as the Appeals Board and the DAR suggest.

[4] While AC Transit suggests that this interpretation, if adopted, would apply to "every driver of every vehicle" doing the "work" of driving, such a construction is obviously overbroad as the regulation is clearly targeted at outdoor places of *employment*. Thus, it would only cover employees who are required to drive or ride in vehicles during the course of their employment, making such vehicles a worksite.

However, as stated in the ISOR, "[t]his limitation is not included in the proposed permanent rule because of the variability of environmental risk factors and the resulting difficulty of predicting with confidence when environmental risk factors for heat illness may be present." (*Ibid.*) And the FSOR expressly refused to reinsert similar language on the same grounds. (FSOR at pp. 3, 15.) Thus, section 3395 is intended to apply to "all outdoor places of employment in California year round, whether or not there is any risk of heat illness." (FSOR at p. 20; see also *id.* at p. 8 [noting Standards Board's belief that "requiring all employers with employees working outdoors to determine the WBGT [Wet Bulb Globe Temperature] on a continuous, or even intermittent, basis would not substantially contribute to control of employee risk of heat illness while at the same time consuming resources that could have a greater effect implementing control measures, such as providing readily available drinking water along with shade and other means of cooling"].)

The Appeals Board argues that this regulatory history suggests that the Standards Board deliberately avoided any language in the regulation that would limit its application based on the presence or absence of environmental risk factors and that the trial court's proposed definition—stating that "if an enclosure or structure does not provide sufficient environmental protections to be considered 'indoor' then it is 'outdoor' "—does exactly that, contrary to the intent of the Standards Board. And, indeed, the trial court appears to have relied on these aspects of the regulatory record in concluding that the history contained "contrary indications" regarding the appropriate definition of outdoor. We agree with the Division, however, that the Appeals Board's argument improperly conflates two very different things.

In adopting the permanent version of section 3395, the Standards Board clearly and repeatedly declined to include environmental triggers for when the heat illness prevention standards would apply to outdoor work due to the difficulties employers would encounter in constantly monitoring employee work environments to determine whether any such adopted thresholds were met. (ISOR at p. 2; FSOR at p. 3.) Thus, once a worksite is determined to be outdoor, section 3395 applies continuously and

prophylactically, regardless of whether there is any current risk of heat illness. (FSOR at p. 20.) In contrast, the Standards Board unequivocally indicated that reference to environmental factors is appropriate in determining whether certain atypical structures or enclosures should be considered outdoor workplaces and therefore subject to section 3395. (FSOR at p. 28.) This approach is not inconsistent with the Standards Board's ban on specific environmental triggers, as any such analysis is a one-time determination focused solely on whether the enclosure in question contains sufficient environmental protections to "significantly reduce the net effect of the environmental risk factors that exist immediately outside." It therefore presents none of the issues of continuing variability and unpredictability that caused the Standards Board to abandon reliance on environmental triggers.

In addition, we are unpersuaded by the Appeals Board's argument that the trial court in this case created a two-pronged test that is contrary to the regulatory language and history. For instance, the Appeal Board contends at length that if outdoor is defined as "not in a building" in accordance to the first prong of the trial court's test, then all work vehicles—whether air-conditioned or non-air-conditioned—as well as underground worksites must be considered outdoor places of employment, contrary to the position of the Division and the regulatory history.[5] The Appeals Board further asserts that the second prong of the trial court's test—defining outdoor to mean an enclosure or structure that does not provide sufficient environmental protections—significantly departs from the plain meaning of the word outdoor.

We do not, however, view the trial court's definition as bifurcated in this way. Rather, outdoor is defined simply as outside of a building, a common meaning of the word. It is only in determining what types of non-traditional structures or enclosures

---

[5] The Appeals Board misreads the regulatory history to the extent it asserts that the FSOR specifically declined to extend the protections of section 3395 to air-conditioned vehicles. Rather, the referenced statement in the FSOR—which we quote in full above—provides only that the Standards Board would not consider *a requirement* that all vehicles provide air conditioning because that suggestion had not been adequately vetted during the rulemaking process.

12

should be deemed *buildings* for purposes of this standard that the regulatory history expressly indicates the need to consider whether the structures or enclosures "significantly reduce the net effect of the environment risk factors that exist immediately outside." If they do not, then the Standards Board's apparent intent is to protect employees working in those environments "from the increased risk of heat illness that can result from working without the environmental protections indoor working environments can provide." (ISOR at p. 2.) The trial court's construction appropriately takes into account this regulatory intent. Thus, under the trial court's definition, neither air-conditioned vehicles nor underground worksites would be deemed "outdoor" due to their inherent cooling attributes. In contrast, it appears from the existing administrative record that AC Transit's non-air-conditioned buses may very well fall within the purview of the outdoor standard.

We determine, then, that the regulatory history in this matter not only strongly supports the interpretation of "outdoor places of employment" adopted by the trial court—which is broad enough to include non-air-conditioned transit buses—but also speaks unambiguously on that issue and is therefore conclusive.[6]

Moreover, the trial court's interpretation of section 3395 is consistent with the underlying purpose of the entire regulatory scheme of which it is a part. Specifically, in the particular context of workplace health and safety here at issue, our high court has reviewed the statutory structure and—noting that the relevant provisions "speak in the broadest possible terms"—has concluded that "the terms of the legislation are to be given a liberal interpretation for the purpose of achieving a safe working environment."

---

[6] Because we find the rulemaking history both dispositive and consistent with the regulatory language, we need not reach the issue of which agency's interpretation, if any, is entitled to greater deference in this context, a question discussed at length by the trial court and strongly disputed by the parties. As stated above, "the ultimate resolution" of this question of regulatory interpretation "rests with the courts." (*Carmona*, *supra*, 13 Cal.3d at p. 310.) If anything, the fact that the two agencies tasked with applying section 3395—the Division and the Appeals Board—fundamentally disagree on its interpretation argues against the existence of any consistent administrative construction to which we should defer. (*Yamaha*, *supra*, 19 Cal.4th at p. 13.)

(*Carmona*, *supra*, 13 Cal.3d at pp. 312-313; see, e.g., Lab. Code, § 6401 ["Every employer shall do every . . . thing reasonably necessary to protect the life, safety, and health of employees."]; *id.*, § 6307 [providing that the Division "has the power, jurisdiction, and supervision over every employment and place of employment in this state, which is necessary to adequately enforce and administer all laws and lawful standards and orders, or special orders requiring such employment and place of employment to be safe, and requiring the protection of the life, safety, and health of every employee in such employment or place of employment"].)  On this basis, the Supreme Court in *Carmona* rejected a narrow agency construction excluding short-handled hoes from the purview of a regulation mandating that unsafe hand tools not be used. (*Carmona*, *supra*, 13 Cal.3d at pp. 305-308.)

The agency in *Carmona* had reasoned that short-handled hoes were not inherently dangerous, but only had the potential to cause harm with extended use in a bent-over position.  (*Carmona*, *supra*, 13 Cal.3d at pp. 305-308.)  However, noting the "clear language of the regulation" and the "comprehensive sweep" of worker safety legislation, the *Carmona* court disagreed, holding that "any hand tool which causes injury, immediate or cumulative, when used in the manner in which it was intended to be used may constitute an 'unsafe hand tool' within the meaning of the regulation."  (*Id.* at p. 313.)  Similarly, in this case, selecting the interpretation of "outdoor" espoused by the trial court both acknowledges the "comprehensive sweep" of worker safety legislation and chooses from among common meanings the interpretation which will best attain the purpose of section 3395, the prevention of heat illness in employees who do not work indoors.  (See *Carmona*, *supra*, 13 Cal.3d at p. 313; *Katz*, *supra*, 117 Cal.App.4th at p. 54 [" ' "where a word of common usage has more than one meaning, the one which will best attain the purposes of the [regulation] should be adopted, even though the ordinary meaning of the word is thereby enlarged" ' "].)

14

Finally, although not necessary to our conclusion, we note that the current version of section 3395 supports our construction of the term "outdoor."[7] As stated above, this iteration of the regulation still applies to "all outdoor places of employment," and that term remains undefined. (Cal. Code Regs., tit. 8, § 3395, subds. (a) & (b).) However, the current regulation includes certain high-heat procedures which are triggered when the temperature equals or exceeds 95 degrees Fahrenheit. (*Id*., subd. (e).) While these high-heat procedures are only applicable to certain industries and would not apply to AC Transit's non-air-conditioned buses, they are nevertheless instructive because, pursuant to the express terms of the regulation, they do apply to the "[t]ransportation or delivery of agricultural products, construction materials or other heavy materials (e.g. furniture, lumber, freight, cargo, cabinets, industrial or commercial materials), *except for employment that consists of operating an air-conditioned vehicle and does not include loading or unloading*." (*Id.*, subd. (a)(2)(E), italics added.) Moreover, subparagraph (2), of which this language is a part, states that it is a "[l]ist of industries *subject to all*

_____

[7] AC Transit's pending motion for judicial notice of the current version of section 3395 is hereby granted, and, on our own motion, we take judicial notice of the 2010 version of the regulations as well. (See Evid. Code, §§ 452, subd. (b); 459, subd. (a); see also Cal. Code Regs., tit. 8, § 3395; former Cal. Code Regs., tit. 8, § 3395 [2010 version].) AC Transit argues that the current version of section 3395 is relevant because it sets forth the requirements that it will be obligated to meet going forward if its non-air-conditioned buses are deemed to be "outdoor places of employment." The Division objects, arguing that the sole issue before this court is whether the term "outdoor" should be interpreted to include non-air-conditioned buses and thus any issues involving AC Transit's ability to comply with the regulation are irrelevant. While we observe that the regulatory structure contains a number of alternatives to strict compliance, we agree with the Division that those questions are not before us. (Lab. Code, §§ 143 [allowing for a permanent variance from an occupational safety and health standard "upon a showing of an alternate program, method, practice means, device, or process which will provide equal or superior safety for employees"], 6450 [permitting Division to grant a temporary variance]; see also Cal. Code Regs., tit. 8, § 3395, subd. (d) exceptions (1) & (2) [allowing alternative procedures for providing access to shade, including use of cooling measures, that provide equivalent protection]; FSOR at p. 46 [noting availability of personal cooling devices].) Instead, we consider both the current version and the 2010 version of section 3395 only as they relate to the issue of regulatory interpretation with which we are here presented.

15

*provisions of this standard*, including subsection (e) [the high-heat procedures]." (*Id.*, subd. (a)(2), italics added.) Since section 3395 continues to apply only to outdoor places of employment and purports to regulate certain non-air-conditioned vehicles, it is apparent that, at least currently, the Standards Board intends "outdoor places of employment" to be interpreted broadly enough to encompass non-air-conditioned vehicles.

In sum, we find the trial court's definition of "outdoor" to be consistent with the language of section 3395 and amply supported by its regulatory history. Moreover, this broader construction comports with the underlying purpose of the entire statutory scheme: the achievement of safe working environments. (*Carmona*, *supra*, 13 Cal.3d at pp. 312-313.) Under such circumstances, we will not here disturb it.

However, in its Order granting the Division's petition for writ of mandate, the trial court—after setting forth the "proper" definition of outdoor for purposes of section 3395—went on to instruct the Appeals Board to determine on remand "whether a bus is physically 'outdoor,' whether employment in a bus is consistently or only intermittently 'outdoor,' and whether AC Transit provided water, shade or a shade equivalent, [and] appropriate training." We agree that the Appeals Board must determine on remand whether AC Transit's non-air-conditioned buses are "outdoor" places of employment for purposes of section 3395. Specifically, as discussed above, the Appeals Board should consider whether the buses at issue "significantly reduce the net effect of the environment risk factors that exist immediately outside." (FSOR at p. 28.) If they do not, they are outdoor worksites subject to section 3395. The Appeals Board need not, however, determine on remand whether employment as a bus driver on these non-air-conditioned buses is only intermittently outdoors as the trial court suggests. Rather, the Standards Board has indicated that even work that is only intermittently outdoors is covered by section 3395 and that "it is the responsibility of the employer to determine if the time spent indoors satisfies the requirements for an adequate supply of water and shade for preventative recovery periods, thus leaving the employer with an obligation to provide training." (FSOR at p. 3.) Finally, the administrative record is clear that AC Transit

16

never argued that it had complied with section 3395 either before the ALJ or the Appeals Board. Thus, it has forfeited this potential defense and is not entitled to raise it on remand.

## III. DISPOSITION

The Order and related Judgment are affirmed in part and reversed in part as set forth herein. The trial court is instructed to vacate the related Writ and issue a new writ of mandate in its place directing the Appeals Board to reconsider its DAR in light of this opinion. Each party to bear its own costs.

_____

REARDON, J.


We concur:


_____

STREETER, ACTING P. J.


_____

SMITH, J.*


*Judge of the Superior Court of California, County of Alameda, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A142799 CA Industrial Relations v. CA OSHA

Trial Court:

Alameda County Superior Court


Trial Judge:

Hon. Evelio M. Grillo


Counsel for Defendant and Appellant:

J. Jeffrey Mojcher; Chief Counsel, California Occupational Safety and Health Appeals Board

Aaron R. Jackson; Industrial Relations Counsel III, California Occupational Safety and Health Appeals Board

Autumn R. Gonzales; Industrial Relations Counsel II, California Occupational Safety and Health Appeals Board


Counsel for Real Party in Interest and Appellant

Robert D. Peterson; Robert D. Peterson Law Corporation


Counsel for Plaintiff and Respondent:

Amy D. Martin; Chief Counsel, Division of Occupational Safety and Health

Allyce Kimerling; Staff Counsel, Division of Occupational Safety and Health


A142799 CA Industrial Relations v. CA OSHA

19